## WARBURTON v. TRUST CO. OF AMERICA.

### (Circuit Court of Appeals, Third Circuit. November 3, 1910.)

### No. 35, March Term, 1910.

1. PLEDGES (§ 29*)—DISPOSITION OF COLLATERAL BY PLEDGEE—LIABILITY TO PLEDGOR.

Under some circumstances a pledgee of collateral may be required to produce it as a condition to enforcing the obligation for which it is security, but not where it has been disposed of in good faith and in a lawful manner in the effort to realize all that was possible out of it, in which case the pledgee is liable only to account for the amount received. If the disposition was unauthorized or improvident, his liability is only for the value of the collateral, and does not affect his right to recover on the obligation of the pledgor to the extent that it exceeds such value.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. § 74; Dec. Dig. § 29.*]

2. PLEDGES (§ 29*)—RIGHTS OF PLEDGEE OF SECURITIES AS COLLATERAL—MODE OF DISPOSING OF PLEDGE.

A provision in an agreement for the pledge of securities as collateral that "it shall be lawful" in case of default for the pledgee to advertise and sell the securities at auction does not limit him to such method of disposition, where another would clearly be to the best interest of both parties.

[Ed. Note.—For other cases, see Pledges, Cent. Dig. § 74; Dec. Dig. § 29.*]

3. PLEDGES (§ 30*)—CORPORATE BONDS AS COLLATERAL—BANKRUPTCY OF CORPORATION—DUTY OF PLEDGEE.

Complainant was a party to an agreement for underwriting an issue of bonds of a corporation, by which he bound himself to take and pay for on demand at any time after one year $15,000 of such bonds, receiving also a bonus in the stock of the corporation. In consideration of such agreement by complainant and others covering the entire issue, defendant, which was trustee under the mortgage, agreed to advance to the corporation as required in its business the full amount of the bonds, and to hold the bonds and bonus stock as collateral security for the several obligations of the underwriters. It was further agreed that defendant should have the right, on default by any underwriter, to enforce his personal liability without recourse to the collateral, or to first sell his collateral and apply the proceeds thereon. The corporation shortly afterward became wholly insolvent and bankrupt, and the general creditors having denied the validity of the mortgage, in order that the property might be sold and to avoid expensive litigation, defendant, which still held the bonds, consented to come in and share with the general creditors, which it did, proving the bonds and receiving a dividend of about 6 per cent. thereon. If the entire proceeds of the property had been applied on the bonds, the dividend

---

would not have exceeded 8 per cent. Having credited complainant with his share of the dividend, defendant brought suit after the expiration of the year, and recovered judgment for the balance due from him on the underwriting agreement. *Held*, that defendant was warranted in handling the bonds as it did, and that such fact did not afford any ground in equity for enjoining the enforcement of the judgment.

[Ed. Note.—For other cases, see Pledges, Dec. Dig. § 30.*]

4. JUDGMENT (§ 713*)—DEFENSES CONCLUDED—WAIVER—ACCEPTANCE OF CREDIT FROM PROCEEDS OF PLEDGED COLLATERAL.

Where, in an action on an obligation secured by a pledge of collateral, plaintiff's pleading disclosed that it had disposed of the collateral, but no defense was made on that ground, and the proceeds were allowed to defendant and accepted as a credit on his obligation, his right to contest the legality of the disposition made of the collateral by plaintiff was concluded by the judgment, and he cannot maintain a subsequent suit in equity to enjoin enforcement of the judgment, on the ground that such disposition was in violation of the contract of pledge or that it was a conversion; nor can such right be revived by a subsequent tender of payment of the judgment, coupled with a demand for the collateral.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1241; Dec. Dig. § 713.*]

Appeal from the Circuit Court of the United States for the Eastern District of Pennsylvania.

Bill by one Warburton against the Trust Company of America. Decree for defendant, and complainant appeals. Affirmed.

For opinion below, see 169 Fed. 974.

W. I. Schaffer and Frank A. Harrigan, for appellant.

Russell Duane, for appellee.

Before BUFFINGTON and LANNING, Circuit Judges, and ARCHBALD, District Judge.

ARCHBALD, District Judge. This is a bill to restrain the enforcement of a judgment, recovered by the defendant against the plaintiff in an action at law in the court below, for the sum of $17,783.84. The action in which the judgment was obtained was brought on an underwriting agreement, in which the plaintiff here (defendant there) subscribed for $15,000 of the first mortgage bonds of an automobile company that failed disastrously. The defendant was the trustee in the mortgage, and the bond issue amounted to $350,000, which was "underwritten" in various sums, by different parties, the plaintiff and others, and on the strength of this "underwriting" the defendant advanced the full amount of the issue. The automobile company having become insolvent and gone into bankruptcy, its property was sold, and the defendant realized on the plaintiff's bonds some $901.97, which it credited on his account, and called on him to make good the rest of his subscription, and upon his failure to do so brought suit, and obtained judgment for the amount which has been mentioned. This judgment having been affirmed by this court (158 Fed. 969, 86 C. C. A. 173), the plaintiff tendered the amount of it, and demanded the bonds, and, the defendant not producing them, filed the present bill to enjoin its enforcement. The plaintiff, as it is contended, is entitled

to his bonds before he can be compelled to pay for them, and the defendant having put it out of its power to deliver them, by turning them in, and participating in the distribution of the money realized from the sale of the mortgaged property, he is absolved from liability. This argument is amplified in many ways, but that is the gist of it.

By the underwriting agreement, to which the plaintiff was a party, a copy of which is reproduced in the margin,[1] it was in substance provided that, at any time after October 1, 1903, the plaintiff, on de-

[1] This agreement, made this 15th day of December, A. D. 1902, by and between North American Trust Company (hereinafter called the "Trust Company"), of the first part, and the persons who shall subscribe their names hereto (hereinafter called the "Underwriters"), of the second part, witnesseth:

Whereas, it is intended to secure underwriting for not exceeding three hundred and fifty thousand dollars ($350,000) par value of the five per centum (5 per cent.) twenty year first mortgage sinking fund gold bonds of the Fournier-Searchmont Automobile Company, a corporation organized and existing under and pursuant to the laws of the state of New York, and to make arrangements with the Trust Company whereby it will make advances to the amount of such underwriting; and,

Whereas, the Trust Company, at the request of the Underwriters, and in part consideration of the execution and delivery of these presents, is about to advance to the Underwriters, or to their nominee, the sum of not less than three hundred and fifty thousand dollars ($350,000) upon the terms and conditions hereinafter set forth, and upon security of the collateral hereinafter mentioned, and of the undertakings of the several Underwriters hereinafter contained; and,

Whereas, each accepted underwriting for ten thousand dollars ($10,000) of said first mortgage bonds shall entitle the Underwriters thereto to ten thousand dollars ($10,000) of such bonds, and also to ten thousand dollars ($10,000) of the seven per centum (7 per cent.) preferred stock of the said Fournier-Searchmont Automobile Company, and also to ten thousand dollars ($10,000) of common stock of the said Fournier-Searchmont Automobile Company, and subscriptions for larger and smaller amounts shall participate in like proportion:

Now, therefore, the parties hereto, in consideration of the premises, and each in consideration of the agreements of the other herein contained, do hereby and severally agree as follows:

First. The Trust Company will from time to time on and after the first day of October, 1902, and in such installments as may be requested by the board of directors of the said Fournier-Searchmont Automobile Company, pay a total aggregate sum of not exceeding three hundred and fifty thousand dollars ($350,000) to the said company.

Second. The Trust Company shall receive interest upon the said loan of three hundred and fifty thousand dollars ($350,000) from the first day of October, A. D. 1902, at the rate of six per centum (6 per cent.) per annum, and shall receive as a commission and as compensation for services hereunder, a sum equal to three per centum (3 per cent.) upon said total sum of three hundred and fifty thousand dollars ($350,000).

Third. Each of the Underwriters agrees for himself only, and not for any other or either of the others, that he will at any time after twelve (12) months from October 1, 1902, upon demand, forthwith repay to the Trust Company the amount set opposite his signature hereto, together with accrued interest thereon, and that the Trust Company shall have the right, in the event of default in payment by any Underwriter, to forthwith proceed against him to recover such amount and the interest thereon, and that the Trust Company shall have the right to enforce such personal liability until the full amount of said loan, with interest and costs, shall have been re-

mand, would repay to the defendant the amount for which he sub-scribed, with interest, which had been advanced on his account, and that, in default, the defendant should have the right forthwith to proceed against him to recover it, enforcing such personal liability to the full amount, without recourse to any collateral security being first had or required. The bonds for which he subscribed, as well as the accompanying stock bonus, were to be deposited with the defendant as collateral security for the plaintiff's share of the advances made by the defendant to the automobile company on the underwriting agreement, and in case of a failure on the part of the plaintiff to comply with the agreement the defendant was to be at liberty to sell such collateral at public auction, after due advertisement for 10 days in some one of the New York City newspapers.

There is nothing complicated in the relation which was so established or in the law growing out of it. The defendant agreed to cash the bond issue on the strength of the underwriting agreement, each

covered by the Trust Company, without recourse to any other party, and without recourse to any collateral security being first had or required.

Fourth. The Underwriters will deposit or cause to be deposited with the Trust Company, as collateral security for the repayment of said loan, or advances, and such interest and commissions, and for the reimbursement of the Trust Company for any and all expenses which said Trust Company may incur by reason of any breach of this agreement on the part of the Underwriters, or any of them, the bonds and shares of the capital stock of the said Fournier-Searchmont Automobile Company in amounts as follows: Five per cent. (5 per cent.) gold coupon bonds of said company, secured by a mortgage which shall be a first lien on all the real estate, plants, franchises, and all other assets of the company to the amount of three hundred and fifty thousand dollars ($350,000) par value, and being all the obligations of said Company secured by said mortgage. Seven per cent. (7 per cent.) preferred stock to the amount of three hundred and fifty thousand dollars ($350,000) par value. Common stock to the amount of three hundred and fifty thousand dollars ($350,000) par value.

Fifth. The Trust Company may, from time to time as they shall become due, detach the interest coupons from the aforementioned bonds, or from such of them as shall not have been disposed of under the provisions of this agreement, and shall collect the same, and the sums so collected shall thereupon be placed to the credit of the Underwriters.

Sixth. The Trust Company may from time to time, until such time as said advances and loans shall be fully repaid to the Trust Company, with all interest due thereon, and all charges which by the terms of this agreement may be incurred by the Trust Company, sell at private sale the aforementioned shares of capital stock of said corporation at such prices satisfactory to the Trust Company for the several classes of securities as may be designated in writing by Percy H. Brundage and Elgin R. L. Gould, or their nominee, and the proceeds of any and all sales made by virtue of the provisions of this agreement shall be applied (1) to the repayment of the amount due to the Trust Company upon said loan or advances, and for interest and charges, and (2) the surplus of such proceeds, if any, shall be distributed among the Underwriters and their assigns, pro rata, in accordance with the amounts set opposite their signatures hereto, when said loan, together with interest and charges as herein provided, shall have been paid: Provided, however, that the Trust Company shall be entitled to receive interest at the rate hereinbefore provided, upon the entire sum of three hundred and fifty thousand dollars ($350,000) for a period of at least three months.

Seventh. In case the Underwriters, or any of them, shall neglect or refuse to keep and perform any or all of their agreements and promises hereinbefore contained, it shall be lawful for the Trust Company to sell the whole or

subscriber in return undertaking to be responsible to the extent of his subscription, and the bonds which he was to take, with the bonus stock, being turned over as collateral to his obligation. At the end of the 12 months, for which it was agreed that the loan should be carried, the plaintiff was therefore liable to the defendant in the sum of $15,000, with interest, which it had advanced on his account, and he was bound on demand to repay it. The bonds for which he subscribed were deposited to secure this, and, on being tendered the amount which the plaintiff was to pay, the defendant was called upon to account for them, but not necessarily to produce them; the defendant having the right, after a default, to dispose or realize upon them the same as upon any collateral. It is not as though the defendant had sold the plaintiff the bonds, which were thus the consideration for his promise, and the case is not to be dealt with upon that basis. The question is not, therefore, whether, when the plaintiff made his tender, the defendant had the bonds in hand to turn over, in default

part of the aforesaid bonds and shares in the capital stock of said corporation at public auction, first giving notice of the time and place of such sale by advertisement for the period of ten days in some one of the public newspapers published in said city of New York; and upon any such sale or sales the Trust Company is hereby authorized to make and execute any and all instruments and do any and all things necessary to vest in the purchaser at such sale a valid title to the shares so sold; and no purchaser at any such sale shall be required to inquire into the necessity of any such sale, nor to see to the application of the purchase money; and upon any such sale or sales the proceeds thereof shall, after the payment of all expenses incidental to such sale, including reasonable counsel fees, be applied by the Trust Company in the manner and for the purposes provided in the sixth paragraph of this agreement.

Eighth. And whenever the Trust Company shall have been fully repaid to the amount of the said loan or advances, together with all other sums of money which may become due to the Trust Company by virtue of the provisions of this agreement, the bonds and shares in the capital stock of said corporation, if any, then in the possession of the Trust Company, shall, by the Trust Company, be transferred and delivered to the Underwriters in proportion to the amounts set opposite their signatures hereto, the expense, if any, attending such transfer, to be borne pro rata by the Underwriters, and in the making of such transfer and delivery due regard being had to any equities that may have arisen between the Underwriters or any of them arising from the performance of their agreements herein contained by some of the Underwriters and the nonperformance of their agreements in whole or in part, by others of the Underwriters.

Ninth. This agreement shall be binding upon and inure to the benefit of the respective legal representatives, successors, and assigns of all the parties hereto, and the counterparts hereof, and each of them shall have the same force and effect as the original.

Tenth. This agreement shall not be binding upon any of the parties until Underwriters to the aggregate amount of three hundred and fifty thousand dollars ($350,000) shall have duly executed the same.

In witness whereof, the Trust Company has caused its corporate seal to be hereto affixed and these presents to be executed by its proper officers thereunto duly authorized, and the Underwriters have hereunto set their names, as well as their proper post-office addresses respectively, and the amounts agreed to be paid by them respectively, as hereinbefore provided, the day and year first above written.

[Signed]  North American Trust Co.,
By Richard J. Coles, Vice P.

Attest: [Signed]  G. M. Wynkoop, Secy.

of which the plaintiff would not be liable, but whether it had disposed of them in such a way that that the plaintiff was discharged from his undertaking.

Of course, the defendant could not sacrifice the collateral, or dispose of it ad libitum, and it did not. It made the most that it could out of the bonds, realizing some six or seven cents on the dollar—a mere pittance, to be sure but apparently there was no help for it. The automobile company having gone to pieces and been put into bankruptcy, after repeated efforts to get a purchaser, its property was sold at the best figure attainable, and the proceeds distributed, for the paucity of which the defendant was in no sense responsible. And the trust mortgage being under fire, and a protracted and expensive litigation being threatened, the defendant, to get anything, had to come in and share with general creditors. This is not to be condemned as a breach of its duty as trustee in the mortgage, nor as a surrender of its preferred place, as a first lien creditor, for an inferior one, to the damage of the Underwriters. It was only by pooling issues with general creditors that the $85,000 realized was secured for the property, and that the defendant got what it did out of it; and the only difference that it made to the plaintiff to divide this around among the bondholders and general creditors jointly, instead of confining it to the bondholders only, amounted to less than $200, to which extent alone could it be claimed that he was prejudiced. Nor, the property having been sold, could the defendant neglect to prove the bonds and get such dividend as was coming on account of them. The lien of the mortgage was discharged by the sale, and the bondholders were remitted to the proceeds, and the defendant, having possession of the bonds, was charged with the duty of presenting them for payment. It clearly would have been answerable, if it had not, for whatever might otherwise have been secured upon them.

In what respect, then, was the defendant derelict? And upon what theory was the plaintiff absolved from his undertaking? It may be that the holder of collateral, under some circumstances, must be prepared to produce it, as a condition to enforcing the obligation for which it is security. Ocean National Bank v. Fant, 50 N. Y. 474. Schlesinger v. Wise, 106 App. Div. 587, 94 N. Y. Supp. 718. But clearly not, where, as here, it has been disposed of in a lawful manner, in the effort to realize all that was possible out of it, in which case the only liability is to account for the amount received, and that was done in the present instance. Brown v. First National Bank, 132 Fed. 450, 66 C. C. A. 293. It is to be remembered that this is an appeal to a court of equity for protection against an alleged injustice, and it must therefore be made to appear that it would be unconscionable to enforce the judgment complained of, which is not the case where the plaintiff has got all that he was entitled to out of the transaction. It is said that the plaintiff had no notice of the proposed action of the defendant with regard to the collateral. There is evidence that he did, and declared that he would have nothing further to do with the matter, charging fraud in the promotion of the company, and repudiating his liability. But it is not material. The want of notice did not avoid what was done. At most, it merely put the defend-

ant on proof of the entire fairness and legality of it, of which there can be no question.

It is urged, however, that the only course open to the defendant, in order to realize on the collateral, was the way pointed out in the seventh clause of the underwriting agreement, by public sale, after due advertisement in a New York newspaper. If the automobile company had remained solvent, or the bonds had a market value, or the plaintiff had demanded it, it may be that this would have been required, although it is to be noted that all that is said in the agreement is that "it shall be lawful," etc., which in terms is permissive, rather than obligatory. Culver v. Wilkinson, 145 U. S. 205, 12 Sup. Ct. 832, 36 L. Ed. 676; Howell v. Dimock, 15 App. Div. 102, 104, 44 N. Y. Supp. 271; Robinson v. Hurley, 11 Iowa, 410, 79 Am. Dec. 497. But a sale of the collateral after bankruptcy would have been ruinous, and, if not against conscience, could not but be regarded as inconsiderate, so that the plaintiff, in insisting on the letter of the contract, makes out no equity. But even if, by the failure to observe this provision, the defendant was liable as for a conversion, which is the most that can be contended, all that could be demanded upon that basis would be that it should account for the value of the collateral. Brown v. First National Bank, 132 Fed. 450, 66 C. C. A. 293. And if there was any value beyond that which was realized, it has not been made clear to us.

But even if the views so expressed were not sound, the matters which are now urged were concluded by the former judgment. A party cannot split up his defenses, but must put in all that he has, or else forego them. This does not apply, of course, to an equitable defense in a federal, court in an action at law, nor to an independent matter of set-off, except where there is a statute which requires it. But if a legal defense, which is available, is omitted, it cannot be asserted afterwards. In the present instance the plaintiff denied liability in the former litigation, on the ground that he had been induced to go into the enterprise by fraudulent misrepresentation. 158 Fed. 969, 86 C. C. A. 173. But if there were other grounds by which he was equally relieved, he was just as much required to put them in, as he was to put in that one. He could not choose on which one of them he would defend and reserve the others, and it does not matter, therefore, whether or not any issue was made on them. If, then, the course prescribed by the underwriting agreement was imperative, and a disposition of the bonds in disregard of it was a breach of the agreement, to the extent that the plaintiff was damaged, it constituted a defense to the action, which he was bound to bring in, if he intended to rely on it. It may be that, treating the disposition made of the bonds as a conversion, and not simply as a breach of contract, the plaintiff, instead of using this as a defense, had an action in tort, which he could have independently prosecuted. Brown v. First National Bank, 132 Fed. 450, 66 C. C. A. 293. But he could not have both. And, unfortunately for his present contention, the amount received on the bonds, $901.97, was put in and accepted as a credit, in reduction of his liability in the former action, and this being the full value of the bonds, and the plaintiff having had the benefit of them in

this way, he could not afterwards sue in trover for their conversion. It is true that the credit was voluntarily allowed by the defendant, without any suggestion by the plaintiff, and a party is not called on, as a rule, to refuse that which his adversary concedes him. But it was known that this credit was the amount realized on the bonds from a sale of the mortgaged property, and having thus got all that was possible out of the transaction, and having knowingly accepted this, the plaintiff cannot now be allowed to repudiate it. 16 Cyc. 787.

Nor is this result affected by the tender and demand for the return of the bonds, which was made by the plaintiff after judgment had been recovered against him. This was the veriest form, and made no new situation. The bonds, if converted, were not converted then, nor by that proceeding. At most, it afforded evidence of it, if the defendant had them and refused to surrender them. But the fact is that the conversion occurred when they were turned in and a dividend obtained upon them, and was right, and not wrongful. The tender thus created no new right, nor added any controlling feature. The liability of the plaintiff on the underwriting agreement was established by the judgment, and while he could not be called upon to pay without the bonds being accounted for, this had already been done, not, of course, by producing and turning them over, which it was known was impossible, and was in fact being counted on, but by crediting the plaintiff with their value in reduction of the amount which would otherwise be due from them, which is all, either in law or in equity, that he could ask for.

The decree is affirmed.