# FIRST AND AMERICAN NATIONAL BANK OF DULUTH v. SOPHIA WHITESIDE AND OTHERS.[1]

May 24, 1940.

No. 32,287.

[1] Reported in 292 N. W. 770.

538

F. H. DeGroat and Abbott, MacPherran, Dancer, Gilbert, Doan & Zuger, for appellants.

Gillette, Nye, Harries & Montague, for respondent.

STONE, JUSTICE.

Action to enforce a pledge of securities. After trial to the court and decision for plaintiff, defendants appeal from the order denying their motion for a new trial. The one issue is whether plaintiff, in foreclosing, will be entitled to judgment against the Whiteside estate for a probable deficiency. Appellants' whole effort, unsuccessful below, is to demonstrate that plaintiff will have no such right.

Robert B. Whiteside was the owner, subject to a mortgage to the Detroit Trust Company for $600,000, of a large tract of timber-land in California. In January, 1927, he contracted for the sale thereof, for $1,804,400, to the Pickering Lumber Company. The price was to be paid $404,000 in cash, $600,000 by assuming and agreeing to pay the mortgage, and $800,000 in four annual installments of $200,000 each on January 5 of the years 1929-1932, inclusive. The Pickering company was to have immediate possession, the deed to be placed in escrow with plaintiff herein, for delivery to the purchaser upon payment of the entire purchase price.

January 5, 1928, Whiteside executed to plaintiff a so-called "collateral trust agreement" to secure an issue of $400,000 of his notes. Thereby Whiteside "sold, assigned, transferred, pledged and set over" to plaintiff all rights to the installments due under his contract with the Pickering company January 5, 1930, and January 5, 1931 (aggregating $400,000) with interest thereon, in

trust for the security of the holders of the notes. He also transferred all his rights under the contract "insofar as the same may be necessary or applicable to enforcing payment of said amounts from the said Pickering Lumber Company." Payments by the latter reduced the amount due under this agreement to $100,000, the time for payment of which was extended to January 5, 1934.

July 5, 1928, there was a similar agreement to secure another issue of Whiteside's notes, this time $200,000 in amount. The terms were similar, and the installment of $200,000 due January 5, 1932, under the Pickering contract was the security. This agreement is subject of a separate action of foreclosure, which awaits the event of this case.

Throughout the determinative period, $100,000 of the installments constituting the security for the agreement of January 5, 1928, and the whole $200,000 constituting the security for that of July 5, 1928, have remained unpaid. Everything owing by the Pickering company to Whiteside had been paid except part of the installments pledged to plaintiff.

September 19, 1931, Whiteside died. Since, his estate has been and remains in process of administration in the probate court of St. Louis county. Plaintiff's claim under the first trust agreement was allowed in the sum of $106,986.30, and that under the second at some $212,000.

In 1931 a receiver was appointed for the Pickering company by the United States district court in Missouri. In 1934 the company filed therein a petition for reorganization under § 77B of the bankruptcy act (11 USCA, § 207).

In 1931, after the death of Whiteside and while the Pickering company was having financial difficulty, a Whiteside noteholders' protective committee was formed. In 1936 there were negotiations between that committee and plaintiff, on the one hand, and the voluntary committee for reorganization of the Pickering company, on the other, touching the treatment, in the plan of reorganization, of the company's indebtedness under the Whiteside contract.

In May, 1936, the Whiteside noteholders made a written proposal calling for the amount of stocks and bonds of the reorganized Pickering company which was ultimately received. The noteholders were to "release the above mentioned claim against the Pickering Lumber Company and deliver to the reorganized Pickering Lumber Company the deed in our possession, * * * which is collateral" for Whiteside's notes. However, it was stated that it would be necessary for the representatives of Whiteside's estate to procure the approval of the probate court of St. Louis county of the plan of reorganization. Mr. DeGroat, as attorney for the executors, signed the letter, consenting to the plan of reorganization and the proposal "subject to the approval of the Probate Court * * *."

December, 1936, plaintiff filed its claim in reorganization (defendants formally consenting), alleging that the Pickering company was "indebted to said plaintiff as trustees under said collateral trust agreement * * * on * * * notes of Robert B. Whiteside." February 19, 1937, there was made and entered in the federal court an order of approval of the plan of reorganization, reciting, among other acceptances:

"Acceptance of said Plan filed by First and American National Bank of Duluth, as Trustee under Collateral Trust Agreement dated January 5, 1928, upon * * * Notes of Robert B. Whiteside * * *."

Pursuant to the statement in the letter referred to above that it would be necessary for the executors of the Whiteside estate to secure the approval of the probate court before they could consent to the plan, Mr. DeGroat did submit to Mr. Nye, attorney for plaintiff bank and the Whiteside noteholders, a proposed form of probate court order, authorizing the executors to give consent. Soon thereafter Mr. Nye was advised by Mr. DeGroat that the probate court would not sign the order submitted, insisting rather upon a form authorizing such consent only upon condition that the claims of plaintiff and the Detroit Trust Company, long ago approved by the probate court, be satisfied and discharged. Mr.

Nye promptly informed DeGroat that plaintiff bank, as trustee and pledgee, could not waive its right to judgment for the deficiency. As a result there was added to the order authorizing consent to the plan, including delivery of the deed held by plaintiff in escrow, only upon the aforementioned condition, the following paragraph:

"The court does not, by this order, assume jurisdiction over any claimants, this order being in the nature of instructions to the representatives relative to their actions. The court does not, by this order, adjudicate any rights of * * * the First and American National Bank of Duluth, as trustee, * * * and this order is not to be considered as prejudicing the rights of said creditors."

This order was made February 17, 1937. It was then probably too late to have determined in the probate court, before the time for filing acceptance or rejection of the plan of reorganization, the right of plaintiff to deliver the deed as escrow agent and retain its claim for a deficiency. Plaintiff therefore determined to foreclose its pledge.

About February 11 plaintiff commenced foreclosure proceedings. Shortly before the time set for sale, plaintiff was advised that the federal court in Missouri had temporarily enjoined the sale, upon complaint in intervention of defendants herein, and had ordered a hearing.

This complaint, among other things recited the probate court order, and asked (1) that plaintiff be directed to satisfy its claims against Whiteside's estate; (2) that plaintiff be directed to deliver the deed held by it in escrow and that the Whiteside noteholders be directed to deliver the Whiteside notes to the Pickering company upon issuance of the stocks and bonds of the reorganized company; (3) that the court enjoin foreclosure sale by plaintiff until hearing; and (4) that plaintiff be directed generally to do all things necessary to carry out the proposed plan of reorganization. The sale was enjoined and the matter deferred to the hearing on the final decree in reorganization.

After hearing, March 27, 1937, the bankruptcy court entered its order continuing its injunction against plaintiff's sale, but otherwise dismissing the intervening petition "without prejudice, however, to the rights of the said interveners and said respondents with respect to the matters and things alleged in said intervening petition." It appeared to the federal court "that the other controversies involved in said intervening petition are more properly cognizable in the courts of Minnesota."

On the same day the court entered its final decree, adjudging, among other things, that plaintiff deliver the deed it held in escrow, and that "the securities to be issued * * * in exchange for said deed shall be delivered to said First and American National Bank of Duluth, to be held by said Bank in lieu of the collateral represented by said contract dated January 5, 1927, and the payments due thereunder." Plaintiff delivered the deed and received in exchange the securities of the reorganized Pickering company. Claiming to hold them merely as collateral, it is seeking a decree of foreclosure, with the intent to claim a judgment for deficiency against Whiteside's estate.

1. First we deny plaintiff's claim that the determinative issue is *res judicata*. The federal court intended to act only to the extent necessary to effect reorganization of the Pickering company. True, the final decree in reorganization stated that the securities were to be held by plaintiff "in lieu of the collateral" under the bank's agreement with Whiteside. But the intention was merely to effect the exchange between the bank and the Pickering company. To hold that it adjudicated rights between the bank and the Whiteside estate would ignore the fact that the latter's complaint in intervention had been dismissed without prejudice because the courts of Minnesota were considered the proper forum for decision of the indicated and reserved questions.

2. The Whiteside-Pickering contract was the usual executory contract for the sale of land, the vendee to pay in installments and the vendor to convey upon completion of the payments. Legal title remained in the vendor as security for the purchase price,

the vendee becoming the equitable owner of the land. Longmaid v. Coulter, 123 Cal. 208, 55 P. 791; Summers v. Midland Co. 167 Minn. 453, 209 N. W. 323, 46 A. L. R. 816. The relationship was similar to that created by mortgage or conditional sale, the beneficial interest being in the vendee and the security interest in the vendor.

3. The contract between Whiteside and plaintiff was in effect a pledge[2] of installments to become due under the Whiteside-Pickering contract. It secured Whiteside's indebtedness to plaintiff and other holders of his notes. Plaintiff was thus a pledgee in trust for itself and other noteholders.

The pledge gave plaintiff, as security, only the installments, with power to collect. It did not transfer the vendor's title to the land. Lamm v. Armstrong, 95 Minn. 434, 104 N. W. 304, 111 A. S. R. 479, 5 Ann. Cas. 418; cf. Church v. Smith, 39 Wis. 492. This is necessarily true, notwithstanding that, upon default of the Pickering company, plaintiff might have foreclosed the vendor's lien.

In that situation, defendants say plaintiff bank exceeded its powers and wronged the Whiteside estate by delivering the deed. There has been much argument as to the power of the federal court in the reorganization to deprive the estate of title. Defendants rely upon In re Lake's Laundry, Inc. (2 Cir.) 79 F. (2d) 326, 102 A. L. R. 247, and In re Burgemeister Brg. Co. (7 Cir.) 84 F. (2d) 388, holding that the reorganization court has no power over the vendor's title to property conditionally sold the debtor. But if defendants are to assert any claim against plaintiff, they must do so on the theory that title has passed. Otherwise there would be no damage to the estate. From that standpoint, we consider the grounds upon which relief is sought by defendants.

Defendants' claim of estoppel cannot be sustained. Knatchbull v. Hallett, 13 Ch. Div. 696, upon which they rely, involved the

---

[2] The transaction was technically an assignment for security. However, for present purposes, the distinction is unimportant, and the relationship of the parties is considered as though there were a pledge.

estate of a fiduciary who had commingled with his own money held in trust. He had withdrawn and wasted part of the fund. The estate was held estopped to assert that the unfaithful solicitor, Hallett, had wrongfully withdrawn the trust money, rather than his own, from the commingled fund. Sir George Jessel was of opinion (p. 727) that "where a man does an act which may be rightfully performed, he cannot say that that act was intentionally and in fact done wrongly." The result was right. But the theory of decision is not satisfactory. The argument of estoppel or conclusive presumption was purely fictional. Now, in similar cases, the defrauded beneficiary may enforce a lien on the commingled fund for his unwilling contribution thereto, made for him by his unfaithful fiduciary. 3 Scott, Trusts, § 517.1. Viewed in its proper light, Knatchbull v. Hallett, 13 Ch. Div. 696, is irrelevant to the present problem.

Here plaintiff has never indicated to defendants that it would not assert its claim against the estate. Until the order of the probate court, no one questioned either the intent or right of plaintiff to deliver the deed and claim a deficiency. And after the probate court order, which was not binding on plaintiff, it made its position perfectly clear. Thus, neither by word nor act has plaintiff ever represented that it would release the Whiteside estate. Nor is there even suggestion that defendants acted in reliance on any assumed representation to that effect. Something of fraudulent or misleading conduct is needed to make an estoppel. In addition, there must be reliance on the appearance created. Neither element is present here.

4. Defendants' claim of novation is factually unsound. There cannot be a novation without "extinguishment of the debt * * * against the original debtor and the shifting of the obligation to a new debtor by mutual agreement between all parties." State v. Wood, 173 Minn. 406, 408, 217 N. W. 360, 361.

Defendants argue that the Whiteside estate was eliminated, plaintiff accepting instead the Pickering company as debtor. The thesis is that only in this way, only by securing full payment

under the Whiteside-Pickering contract, could plaintiff rightfully deliver the deed it held in escrow.

The burden of proof of novation is upon the debtor who asserts that he has been discharged. 6 Williston, Contracts (Rev. ed.) § 1875. There is no indication that plaintiff intended that result. Nor does there appear to have been reason for plaintiff, who possessed a claim against the Whiteside estate, secured by obligations of the Pickering company, to release the former in order partially to realize upon the latter. And, when the question of releasing the estate first arose, plaintiff promptly disclaimed any such intention.

Defendants urge that plaintiff had no right to realize on the collateral, if that meant delivery of the deed, without getting payment of the debt due from the Pickering company. So, the argument proceeds, the parties must have intended a novation. The debt of the Pickering company to Whiteside's estate was just equal to the debt of the latter to plaintiff. But there is no evidence that plaintiff or the Pickering company understood that plaintiff had no right to deliver the escrowed deed without payment in full. And, even assuming that a wrong has been done to the Whiteside estate, that fact would give no more basis for an enforced novation, on the ground of presumed intent, than it would for an estoppel. Either result would be based on reasoning that is unsound because based on pure fiction.

5. A pledgee of tangible personalty may not resort to it for his own purposes prior to foreclosure of the pledge. Brown, Personal Property, § 129, p. 576. A pledgee of a chose in action (such as the involved installments) is in a different position. Pursuant to his duty to conserve the collateral, the pledgee of such an obligation might use reasonable diligence to collect. Brown, Personal Property, § 134, p. 600; Lamberton v. Windom, 12 Minn. 151 (232), 90 Am. D. 301. In the case of pledged commercial paper, foreclosure is not permitted, for a sale would result in sacrifice. This is especially true when the obligor is insolvent.

The pledgee is under no absolute duty to collect the full amount of the obligation. His duty is one of good faith and reasonable diligence in the realization of as much as possible for himself and pledgor. In case of insolvency of the obligor, an advantageous compromise, made in good faith, it has been held, will not render the pledgee liable. Exeter Bank v. Gordon, 8 N. H. 66; Fant v. Miller & Mayhew, 17 Gratt. 187; Warburton v. Trust Co. of America (C. C.) 169 F. 974; affirmed (3 Cir.) 182 F. 769.

For this case, the question is whether plaintiff acted in good faith and with reasonable diligence to make the best of a critical situation. Its field of choice included foreclosure of the pledge, foreclosure of the vendor's lien, and prosecution of the chose in reorganization proceedings. As already seen, it might have been guilty of a wrong to the Whiteside estate had it foreclosed its lien on the installments. At defendants' instance, an attempted sale had been enjoined.

In addition to the title in the Whiteside estate, there was also a vendor's lien. 27 R. C. L. p. 598. See National Cash Register Co. v. Ness, 204 Minn. 148, 282 N. W. 827 (conditional sale of a chattel). It is recognized that a pledgee of a purchase price obligation may enforce the lien. But in the instant case there was an obstacle. The Pickering bondholders had acquired the mortgage of the Detroit Trust Company and threatened to foreclose. There was past due $300,000 and interest. Owing to the plight of the timber industry at the time, there was good chance that foreclosure would have produced no surplus over the mortgage debt. Plaintiff, as pledgee, would have been under no duty to redeem, and the Whiteside estate could not have done so. In short, there was strong possibility that foreclosure of the vendor's lien would have resulted in loss of title without realization of anything on the pledge.

Defendants suggest that if plaintiff had foreclosed the lien and recovered the land, foreclosure of the mortgage could have been long postponed under the California moratorium law, "during which time the Whiteside interest or plaintiff bank might have found a purchaser or refinanced the existing obligations against

it." At best, that is but intriguing afterthought rather than determinative inference. It is the conjecture of critical disappointment rather than a conclusion of sound reasoning.

A pledgee has rights as well as duties. Here plaintiff loaned money on the collateral. The principal debt had been due for years. There was no immediate prospect of payment. In such case it is less than reasonable to look only to the interest of the pledgor. Plaintiff was under no duty to postpone for more years the enforcement of its security.

As to the fairness of the settlement, we think no point can now be made. The matter had long been the subject of discussion. Mr. DeGroat apparently regarded the result as satisfactory. He had approved, subject to order of the probate court, the letter of May, 1936, proposing the solution later effected. He then drew an order authorizing consent to the plan for submission to the probate court. No mention of discharge of the Whiteside debt was made. The inference is strong that until the suggestion of the probate judge the compromise was considered fair by all concerned.

Treating the exchange of securities as a compromise by the pledgee of the original debt pledged, we hold it beyond reach of successful attack by the pledgor. That result, in such an extreme case as this, gets much support from the substantial extent to which the representatives of the pledgor's estate actively participated in and approved the procedure which required and effected the exchange. They approved of everything plaintiff did or proposed to do up to the moment when the probate court conditionally refused its order of approval. That was too late for the representatives of the Whiteside estate to back out.

Stressed for defendants is § 91 of the probate code, 3 Mason Minn. St. 1940 Supp. § 8992-91:

"Whenever it appears for the best interest of the estate, the representative may on order of the court effect a fair and reasonable compromise with any debtor or other obligor."

That section does generally make prerequisite to an effective compromise by a representative the approval of the probate court. But it does not vest in that tribunal the right arbitrarily to withhold approval. The issue has now been litigated and decided in the district court. So the mere absence of probate court approval of plaintiff's action is not a bar to judgment. The issues were not litigated in the probate court. Had they been, the refusal of an order of approval, on the facts as they now appear, could not have been sustained. Furthermore, the order of the probate court, with its reservations, may well be considered as intentionally leaving the matter open for decision elsewhere.

We conclude that plaintiff may rightfully pursue the course chosen. The right to compromise the pledged installments included the right, against the Whiteside estate, to conveyance of their security, if that was necessary. In the ordinary case, suit against the estate to compel such conveyance would have been necessary. But here plaintiff, having possession of the deed as escrow holder, could deliver it. Having acted within its rights, it cannot be penalized as defendants desire.

Affirmed.