[Civ. No. 6705. Third Dist. Aug. 29, 1942.]

PICKERING LUMBER CORPORATION (a Corporation), Respondent, v. SOPHIA WHITESIDE as Executrix, etc., et al., Appellants.

Wm. M. Abbott, Cyril Appel, Ivores R. Dains, F. H. De Groat and George E. Baglin for Appellants.

Rowan Hardin, Paul Barnett, Watson, Ess, Groner, Barnett & Whittaker and Brobeck, Phleger & Harrison for Respondent.

ALLEN, J. pro tem.—This is an action to quiet title to a large tract of timber land situated in Tuolumne and Calaveras Counties. The appeal was taken by defendants from a judgment in favor of plaintiff. The various transactions bearing on the problem involved are evidenced by many instruments and records of judicial proceedings. For the purpose of clarity it may be well to set out the matter in controversy before examining the facts and pleadings. The transcript contains a lengthy stipulation of facts. Briefly

stated, the problem is this: Plaintiff's predecessor in interest, Pickering Lumber Company, entered into a written contract with Robert B. Whiteside and Sophia Whiteside, his wife, in which said Pickering Lumber Company agreed to pay a stipulated consideration for said tract of land, all of which consideration has been satisfactorily paid, except the sum of $300,000 and interest thereon. Plaintiff contends that this $300,000 obligation and interest thereon was extinguished by an accord and satisfaction consummated by the duly authorized representatives of the parties to the contract, and that, in pursuance thereof the United States District Court in Bankruptcy, at Kansas City, Missouri, having jurisdiction of the subject matter and the parties, approved such accord and satisfaction, and by its final judgment and order directed the delivery of the deed, in evidence of the title which had passed; and that this judgment is a bar to defendants' assertion of any claim to title or interest in the lands.

The essential facts are as follows: Robert B. Whiteside was the owner, subject to a mortgage to the Detroit Trust Company, of this large tract of timber land. On January 5, 1927, he contracted for the sale thereof for $1,804,400 to the Pickering Lumber Company. The price was to be paid, $404,400 cash on execution of the contract, $600,000 by assuming and agreeing to pay the outstanding mortgage, and $800,000 payable in four annual installments of $200,000 each on January 5th of the years 1929 and 1932, inclusive. The Pickering Lumber Company was to have immediate possession, the deed to be placed in escrow with First National Bank of Duluth, Minnesota, for delivery to the purchaser upon payment of the entire purchase price, payments to be made to said bank to and for the account of Whiteside.

On January 5, 1928, Whiteside executed to the First National Bank of Duluth a so-called "collateral trust agreement" to secure an issue of $400,000 of his notes. Thereby Whiteside "sold, assigned, transferred, pledged and set over" to said bank all rights to the installments due under his contract with Pickering Lumber Company on January 5, 1930, and January 5, 1931 (aggregating $400,000), with interest thereon, in trust for the security of the holders of the notes. He also transferred all rights under the contract "insofar as the same may be necessary or applicable to enforcing payment of said amounts from said Pickering Lumber Company." Payments by the said company subse-

quently reduced the amount due under this agreement to $100,000, the time of payment of which was extended to January 5, 1934.

On July 5, 1928, there was a similar agreement with said bank to secure another issue of Whiteside notes, this time $200,000 in amount. The terms were similar, and the installment of $200,000 due January 5, 1932, under the Pickering contract was assigned as security. The First National Bank of Duluth and American Exchange National Bank of Duluth consolidated under the name of First and American National Bank of Duluth, which succeeded to all the rights, duties and obligations of the First National Bank of Duluth.

Throughout the determinative period, $100,000 of the installment originally due January 5, 1930, and the whole of the $200,000 due January 5, 1932, and interest thereon, assigned to the bank as security for the Whiteside notes, have remained unpaid. Everything else owing by the Pickering Lumber Company to Whiteside has been paid, except this part of the said installments so assigned to the bank.

On September 19, 1931, Whiteside died. His estate is in process of administration in the probate court of St. Louis County, Minnesota, with ancillary administration pending in the probate court of the State of California, in and for the city and county of San Francisco, the defendants being executors under the will of deceased in both courts. The bank's claim on the Whiteside first notes and first trust agreements owned by it was allowed by the Minnesota probate court for $106,986.30, and also the bank's claim as trustee under the second trust agreement in the sum of $212,000. Under the Minnesota law these amounts became judgments against the Whiteside estate.

In May, 1931, a receiver was appointed for the Pickering Lumber Company, by the United States District Court in Missouri. In November, 1934, the company filed therein a petition for reorganization under section 77-B of the Bankruptcy Act, 11 U. S. C. A. section 207.

In 1931, after the death of Whiteside, and while Pickering Lumber Company was having financial difficulty, a Whiteside Noteholders' Protective Committee was formed. In 1936 there were negotiations between that committee and the bank, a Pickering Bondholders' Committee which had been formed, and the voluntary committee for reorganization of Pickering Lumber Company, touching the treatment in the plan of

organization of the company's indebtedness under the Whiteside contract.

The bank filed three claims against the bankrupt, either on the "Whiteside notes" or the security held thereunder on Pickering Lumber Company's obligation to pay the installments on the Whiteside contract, depending on the construction of the language in the claims. One of these was on the $100,000 obligation "as trustee," reserving its right to the security; another was on this $100,000 obligation "as owner," with the same reservation; the other was on the $200,000 obligation "as trustee," with same reservation. The noteholders' committee filed a claim on the $200,000 obligation, "on behalf of owners," with same reservation. The claims of bank as owner, and of noteholders' committee "on behalf of owners" were allowed, and the other two claims were disallowed.

In May, the Whiteside noteholders made a written proposal, "to release the above mentioned claim against the Pickering Lumber Company, and deliver to the reorganized Pickering Lumber Company the deed in our possession," and receive in return therefor $105,000 of 4 per cent income bonds, $195,000 of 5 per cent non-cumulative preferred stock, and 3,000 shares of common stock of the reorganized Pickering Lumber Company. (The deed should have been in possession of the bank, as escrow-holder, and not the noteholders.) However, it was stated in the proposal that it would be necessary for the representatives of Whiteside's estate to procure approval of the probate court of St. Louis County, Minnesota, of the plan of reorganization. Mr. De Groat, as attorney for the executor, signed a letter consenting to the plan of reorganization and to the proposal, "subject to the approval of the probate court . . ."

On February 19, 1937, the federal court entered an order of approval of the plan of reorganization, accepting the proposal in regard to the Pickering-Whiteside note obligations. On February 17, 1937, the Minnesota probate court made an order authorizing the executors to consent to the plan for exchange of securities of the reorganized Pickering Lumber Company in return for the deed, and authorizing them to direct the bank to deliver the deed held in escrow on condition that the claims on Whiteside's notes which were judgments against the estate, would be satisfied and discharged.

The bank, holding as trustee, apparently believing it had no legal right to waive a possible deficiency judgment on the

Whiteside notes, commenced foreclosure proceedings on the securities it held, and advertised the same for sale. The Minnesota executors of the Whiteside estate then filed a petition in intervention in the bankruptcy court. It set out the probate court order, and asked that the bank be directed to satisfy its claim against Whiteside's estate; that the bank be directed to deliver the deed held in escrow, and that the Whiteside noteholders be directed to deliver the Whiteside notes to Pickering Lumber Company upon the issuance of the stock and bonds of the reorganized company; that the court enjoin foreclosure sale by the bank until after hearing; that the bank be directed generally to do all things necessary to carry out the proposed plan of reorganization; and that the court enter an order upon respondents to show cause why the directions and orders prayed for should not be granted. The sale was ordered withdrawn, and the matter set for hearing.

On March 17, 1937, the bankruptcy court entered an order directing the bank to withdraw the sale without prejudice to respondents' rights. On March 26, 1937, the petition in intervention was heard, and the order of March 17th was reaffirmed. Otherwise the court dismissed the intervening petition "without prejudice, however, to the rights of the said interveners (Whiteside executors) and respondents (First and American National Bank of Duluth, A. C. Weiss, Charles D. Brown, Robert W. Hotchkiss) with respect to the matters and things alleged in said intervening petition." On March 27, 1937, the bankruptcy court entered its final decree in the reorganization proceedings adjudging, among other things, that the bank deliver the deed it held in escrow, and that "the securities issued . . . in exchange for said deed, shall be delivered to said First and American National Bank of Duluth, to be held by said Bank in lieu of the collateral represented by said contract dated January 5th, 1927, and the payments due thereunder."

On April 24, 1937, the bank petitioned the bankruptcy court for protection in making delivery of the deed, and the court, by an ex parte order, directed that the bank deliver the said deed to the judge of said court, to be by him deposited with the clerk of said court, and that said delivery should constitute compliance by the bank, as trustee, with the court order in the final decree of March 27, 1937. The plaintiff, Pickering Lumber Corporation, is the reorganized corporation growing out of said reorganization plan, and is composed

of the bondholders, other creditors and stockholders of Pickering Lumber Company. On April 24, 1937, on further order of the bankruptcy court, the clerk of said court delivered said deed to plaintiff. Plaintiff promptly recorded the deed in California and began this action to quiet title.

The bank brought an action in the District Court of St. Louis County, Minnesota, to determine its right to a deficiency judgment on the Whiteside notes in case the proceeds from the sale of the securities received by it in the reorganization proceedings were insufficient to pay the same in full. The district court adjudged that the bank would be entitled to such deficiency, and the Supreme Court of Minnesota affirmed the decision. (*First & American National Bank of Duluth* v. *Whiteside, et al,* 207 Minn. 537 [292 N. W. 770].)

■ The legal questions involved in this maze of facts will now be considered and analyzed. Plaintiff contends that the effect of the contract of January 5, 1927, was to pass title to Pickering Lumber Company; that this contract gave the vendee all the rights of a mortgagor, and reserved to the vendor only the rights of a mortgagee,—that it was, in effect, a deed. With this contention of the plaintiff we cannot agree. It is very plain that the contract was an executory contract of sale, and that title remained in the vendor. The language of the contract permits of no other construction. It states: "Vendors shall sell and convey to the purchaser, and the purchaser shall purchase from the vendors, for the price and upon the terms and conditions hereinafter set forth, the lands." It also states: "If the purchaser shall pay for said lands as herein provided, the vendors shall, and they covenant that they will make, execute and deliver to the purchaser, a good and sufficient general warranty deed . . . conveying to the purchaser . . . title in fee simple to all of said lands." It also states: "When the purchaser has paid the entire purchase price as hereinabove provided . . . said bank shall deliver said deed to the purchaser." Also, in providing for rights and remedies, in case of default by the purchaser, the contract states: "The vendors may, without prejudice to their position or rights as owners of the property, make such bid." These clauses, and other language employed throughout the instrument, indicate that the vendor has rights far beyond those of a mortgagee; for instance, "specific performance," "to bid on the property, and in the event that no bid

or bids are received from others, higher than the highest bid of the vendors . . . the vendors may call the sale off, credit the amount bid, and sue for a deficiency." No such rights are given to a mortgagee. (*Fisher* v. *Chaffee,* 49 Cal. App. (2d) 97 [121 P. (2d) 51] ; *Stanislaus Water Co.* v. *Bachman,* 152 Cal. 716, 722, 723 [93 Pac. 858, 15 L. R. A. (N. S.) 359].) In fact, the language of the instrument is so plain that it did not transfer title, that it requires no further citation of authority. The case of *First & American National Bank of Duluth* v. *Whiteside,* 207 Minn. 537 [292 N. W. 770], *supra,* speaks of it as a contract of sale. After the execution of this contract, Whiteside still held title, subject to the first mortgage of the Detroit Trust Company.

The next transactions involve the Whiteside "collateral trust agreement" to the Duluth Bank to secure an issue of $400,000 of his notes, by means of which Whiteside "sold, assigned, transferred, pledged and set over" to the bank all rights to the installments due on the Pickering contract on January 5, 1930, and January 5, 1931, with interest thereon, in trust as security for the holders of the notes, and also transferred all rights "insofar as the same may be necessary or applicable to enforcing payment of said amounts from said Pickering Lumber Company"; and the subsequent agreement, in regard to the loan by the bank of $200,000, by which Whiteside assigned the final payment under the Pickering contract.

These were security transactions insofar as they affected the Pickering contract; they did not transfer Whiteside's title. He held the title to the land as security for these payments. This assignment, being a security transaction, created an equitable lien or mortgage on the Whiteside tract. (*Roller* v. *Smith,* 76 Colo. 371 [231 Pac. 656] ; *Farmers & Merchants Nat'l Bank* v. *Arrington* (Tex. Civ. App.) 98 S. W. (2d) 378; vol. 5, Tiffany Real Property (3rd ed.), § 1573; vol. 4 Pomeroy's Eq. Jur. (5th ed.), § 1259, page 763.) These authorities clearly determine that the effect of these transactions, insofar as Whiteside's land was concerned, was an equitable second mortgage on his land, held in trust by the bank. We must bear in mind that the bank owned the mortgage but not the land. The Whiteside notes constituted the mortgage debt, and the land was Whiteside's security that Pickering Lumber Company would pay an amount sufficient to satisfy the Whiteside notes. This was a relationship existing

between Whiteside and the bank, to which the Pickering Lumber Company was not a party. After the contract of January 5, 1927, Whiteside had a debt, claim, or chose in action against Pickering Lumber Company; Pickering Lumber Company was a party to that transaction, and this debt, claim, or chose in action Whiteside transferred to the bank as security for the payment of his notes. The value of this debt, insofar as the Pickering Lumber Company was concerned, depended entirely upon that company's ability to pay. The Pickering Lumber Company held no title to the Whiteside tract to back it up. Its value, insofar as the Pickering Lumber Company was concerned, did not depend upon the value of the Whiteside tract. The bank also received Whiteside's separate personal promise to pay the notes, backed by his financial ability to pay. Whiteside had the right to expect that if the bank required him to pay the notes, it would return his security, consisting of the equitable second mortgage.

At the time the plan of reorganization was proposed, what rights or interests did each party own? Pickering Lumber Company owned an executory contract giving it a right to purchase the Whiteside tract upon payment of the purchase price, and it also had a valuable equity therein for the payments it had already made. Duluth Bank held an equitable second mortgage on the Whiteside tract, as security for the payment of the Whiteside notes, these notes being the mortgage debt. Whiteside estate owned and held title to the Whiteside tract, subject to the equitable second mortgage held by the Duluth Bank, and the contract of purchase held by Pickering Lumber Company.

Who were the parties to the compromise plan or purported accord and satisfaction? The Whiteside estate was not a party thereto, because its acceptance thereof was conditional upon full satisfaction of the Whiteside note obligations, which condition was never complied with. Therefore, the only parties to this compromise, insofar as it affects this case, were the Duluth Bank and Pickering Lumber Company, the bankrupt corporation. The Pickering Lumber Company agreed to transfer, and did transfer to the reorganized corporation, Pickering Lumber Corporation, all its rights and interest in the Whiteside tract, to wit: Its equity therein, and its right to purchase and acquire title upon full payment of the purchase price; and the reorganized corporation, in consideration therefor, did agree to issue and deliver, and did so issue

and deliver to Duluth Bank, a creditor of the bankrupt corporation, certain of its stock and securities, and Duluth Bank did agree to deliver to the reorganized corporation, and did deliver, the deed to the Whiteside tract, which it held in escrow, but was authorized to deliver only upon full payment of the purchase price of the Whiteside tract according to the contract of January 5, 1927; and it also undertook to relieve the bankrupt corporation from any further payments under the contract of January 5, 1927, and to pass to the reorganized corporation, title to the Whiteside tract, which was retained to Whiteside in said contract as security for such payment in full, and to still hold and retain to itself the equitable mortgage debt, to wit: the Whiteside notes.

We believe that the attempt of the bank to pass title to land it did not own was futile, as was the attempt to separate the mortgage from the mortgage debt. To illustrate: ''A'' owns a tract of land, subject to an executory contract of sale held by ''B,'' on which X amount will become due, and must be paid before ''B'' is entitled to title, and for the payment of which X sum, ''A'' holds the title as security. ''A'' borrows X amount from ''C'' on his, ''A's'' promissory note, and assigns the X amount coming to him from ''B'' under the contract to ''C'' as security for the payment of the X amount of ''A's'' note. This creates an equitable mortgage on ''A's'' land, held by ''C,'' and ''A's'' note being the mortgage debt. It is obvious that ''C'' cannot cancel the amount X, or any part of it, due ''A'' under ''B's'' contract, and for the payment of which ''A'' holds title to the land as security, and pass title to the land to ''B'' and still hold ''A'' on his note. Under these circumstances the mortgage debt and mortgage cannot be separated. The fact that the land may have been of little or no value above the encumbrance did not give the parties the right to compromise and to transfer title to this land in the making of the accord and satisfaction. The owner of land, no matter what its value, cannot be deprived of his property without due process, and the law has established the procedure which must be followed.

The equitable mortgage lien will subsist until the debt it was given to secure (Whiteside notes) is paid in full, or the mortgage lien foreclosed in the manner provided by law.

Although a vendor in an executory contract for the sale of land who retains title to such land as security for the payment of the purchase money, sues to recover the unpaid con-

tract price, and obtains judgment thereon, which judgment has not been paid in full, the suit for the unpaid contract price and recovery of such judgment do not affect the vendor's right to foreclose against such land held as security for any uncollected or unsatisfied portion of the purchase money. (*Longmaid* v. *Coulter*, 123 Cal. 208 [65 Pac. 791].)

The equitable mortgage was executed by Whiteside, to secure his notes, and not Pickering Company's obligation to pay the contract price. The fact that Whiteside held title to the land to secure him for the payment of Pickering Company's contract obligation did not cause the Pickering Company's contract to be a mortgage, nor was the obligation of Pickering Company to pay the contract price, a mortgage debt. (13 Pomeroy's Eq. Jur., 4th ed., p. 3041, § 1260; *Maltby* v. *Conklin*, 50 Cal. App. 201, 204 [195 Pac. 280].) The distinction being, that in a mortgage, the mortgagor holds title to the land, and the mortgagee has a lien on the land for the payment of the mortgage debt, while in an executory contract of sale, the vendor holds the title to the land as security for the payment of the purchase price, which is more effective than a lien. Nor did the assignment by Whiteside of his claim against Pickering Company under the contract, as security for the payment of his notes, change this obligation of Pickering Company under its contract, to a mortgage debt, because this assignment did not transfer the vendor's title to the land to Pickering Lumber Company.

The contract of assignment is to be construed according to the laws of Minnesota, but any contract affecting title to real property situated in California is to be construed according to the laws of California. An "equity of redemption" is an interest in real property. (*Graves* v. *Arizona Cent. Bank*, 205 Cal. 715 [272 Pac. 1063]; *Grant* v. *Cumberland Valley Cement Co.*, 58 W. Va. 162 [52 S. E. 36].)

It is apparent that after the reorganization plan was consummated and approved by the federal court, unless the Whiteside estate was barred by the order and judgment of the said court, Whiteside's estate still held title to the land, subject to the equitable mortgage held by Duluth Bank, and the contract of sale of January 5, 1927, held by Pickering Lumber Corporation.

We will now consider whether or not the judgment of the Federal Court is a bar to defendant's assertion of any claim to the lands in question.

Section 77-B of the Bankruptcy Act gives the bankruptcy court exclusive jurisdiction over the debtor's property and assets wherever situated. (Title 11, U. S. C. A., § 207.) Executory contracts may constitute valuable assets, and it is customary in bankruptcy proceedings to either affirm or reject the obligation thereon. Rejection would give the vendor a claim for damages, if any, and affirmance would give him a right to the contract price before title could be taken from him. (*Consolidated Gas, Electric Light & Power Co. of Baltimore* v. *United Rys. & E. Co.,* 85 F. (2d) 799; *In re Burgemeister Brewing Co.,* 84 F. (2d) 388, 389; *In re Ideal Laundry,* 10 F. Supp. 719; *In re Lake's Laundry,* 11 F. Supp. 237.) In the case at bar the bankruptcy court did not reject the contract. There is no doubt that if it had acquired jurisdiction over the parties, it had the right to require the contract to be performed; and if and when the contract was performed, to direct the delivery of the deed. It also had a right to direct a foreclosure on the securities held in the security transaction, as the security-holder (the bank), had submitted to its jurisdiction; but it had no jurisdiction over the Whiteside executors without bringing them in by proper process, or unless they voluntarily submitted to its jurisdiction. If it had ordered the bank to foreclose on its securities, the bank could only have sold the equitable mortgage, and the debt secured thereby, together and not separately. If the equitable mortgage and debt were sold and acquired by Pickering Company, it no doubt could then be foreclosed in the bankruptcy court (*In re Murel Holding Corporation,* 75 F. (2d) 941), provided the parties to the mortgage were before the court or submitted to its jurisdiction.

In this case the Whiteside executors came before the bankruptcy court by filing a petition in intervention to enjoin the bank from the threatened sale of securities unless it satisfied the claims which it had filed against the Whiteside estate. It is perhaps true that the bankruptcy court might have then tried, determined and adjudicated the issues between the bank and the Whiteside executors, as to the right to the delivery of the deed. If it can fairly be said it did this, the judgment of the bankruptcy court is res judicata, and, although perhaps erroneous, is a bar to defendants in this action; but if, as appears to be the case, the petition was dismissed without prejudice, nothing was adjudicated thereby as against interveners. (*Goddard* v. *Security Title Ins. & Guar. Co.,* 14

Cal. (2d) 47 [92 P. (2d) 804]; *North Carolina Ry. Co.* v. *Story*, 268 U. S. 288 [45 S. Ct. 531, 69 L. Ed. 959].), and they have no right to appeal and are not barred thereby. (*Brunswick Tire Corp.* v. *Credit Tire Stores, Inc.*, 8 Cal. App. (2d) 69, 70 [46 P. (2d) 804].)

The question to be determined then, is: Did the bankruptcy court adjudicate the question herein involved? The order of March 17, 1937, was that the bank should withdraw and discontinue the sale, and "that the rights of said respondents (the bank and noteholders' committee), with respect to the matters and things alleged in interveners' petition herein, shall not thereby be prejudiced"; that is, the bank, noteholders and Whiteside executors were relegated to the same situation they had occupied before the notice of sale was started, and the court, in said order, reserved "jurisdiction to hear and determine, insofar as it has jurisdiction to do so, all matters and things set forth in said intervening petition, at the time of the hearing upon the final decree in said reorganization proceedings." On March 26, 1937, further hearing on interveners' petition was had. The court reaffirmed its former order, insofar as it had ordered withdrawal and discontinuance of the sale by the bank, reciting that "it appearing to the court that the other controversies involved in said intervening petition are more properly cognizable in the courts of Minnesota."

What were the other matters? According to the petition in intervention they were the satisfaction of the bank's claim against the Whiteside estate, and the surrender of all Whiteside's notes to the executors, and a direction to deliver the deed in exchange for the securities of the reorganized corporation. The order further continued: "Except as above provided, said intervention petition be, and it hereby is, dismissed, without prejudice, however, to the rights of said interveners and said respondents with respect to the matters and things alleged in said intervening petition." That order meant that except as to the withdrawal of the sale, without prejudice to any rights of the bank or noteholders' committee, the petition was dismissed "without prejudice." After this, the final decree was made, directing the delivery of the deed in exchange for the securities mentioned. But when, as was the case, the interveners' petition was dismissed "without prejudice," interveners were no longer before the court. They were not parties. They had filed no claim in the bank-

ruptcy proceedings. They had no right to appeal, and the court had no power to take title to their land away from them.

Assuming that the bankruptcy court did have a right to order the bank to deliver the deed, which we believe it could not do without having the Whiteside executors as parties to the proceedings, it could not adjudicate their property rights. Therefore, the defendants are not bound by the decree in bankruptcy. In the case of *First and American National Bank* v. *Whiteside, supra,* the Minnesota court held this decree was not res judicata in that action, and we hold that it is not res judicata in this action.

Therefore, we determine that the defendants hold title to the Whiteside tract, subject to an equitable mortgage lien thereon for any unpaid remainder of the Whiteside notes, and also subject to the contract of January 5, 1927; and that the deed of record was delivered without authority, and conveys no title to the lands therein described, and will not become effective to transfer title until the full contract price is paid according to the terms of said contract of purchase.

The judgment is reversed, with directions that a judgment be entered adjudging defendants to be the owners and holders of title to the lands described in the complaint, subject, however, to a lien thereon for any unpaid remainder of the Whiteside notes, and subject, further, to the terms and conditions of the contract of purchase of January 5, 1927.

Adams, P. J., and Thompson, J., concurred.

A petition for a rehearing was denied September 26, 1942, and respondent's petition for a hearing by the Supreme Court was denied October 26, 1942.