Glennie I. EPLAND and Dale L. Epland, her attorney in fact, Appellants,

v.

MEADE INSURANCE AGENCY ASSOCIATES, INC., et al., Lumbermen's Mutual Casualty Company, Reserve Life Insurance Company, National Financial Insurance Company, Respondents.

No. C5–95–1519.

Court of Appeals of Minnesota.

April 2, 1996.

Review Granted May 30, 1996.

402

Richard H. McGuire, James B. Lund, Minneapolis, for Glennie I. Epland and Dale L. Epland.

Allan J. Zlimen, Minneapolis, for Meade Ins. Agency Associates, Inc.

John F. Beukema, Faegre & Benson, Minneapolis, for Lumbermen's Mut. Cas. Co.

Jeanne H. Unger, Rider, Bennett, Egan & Arundel, Minneapolis, for Reserve Life Ins. Co.

James R. Gray, Gilmore, Aafedt, Forde, Anderson & Gray, Minneapolis, for National Financial Ins. Co.

Considered and decided by PARKER, P.J., and SCHUMACHER and MANSUR, JJ.

## OPINION

MANSUR, Judge. *

Glennie Epland, through her personal representative Dale Epland, appeals from the dismissal of her claims for reimbursement of nursing home care expenses, arguing the respondent insurance companies failed to get her consent for their sale of her insurance policy.

## FACTS

In February 1979, Bernie and Glennie Epland purchased a hospital indemnity insurance policy with a nursing home rider from Lumbermen's Mutual Casualty Company (Lumbermen's). The Eplands paid annual premiums for this policy from 1979 until 1987.

In July 1987, Reserve Life Insurance Company (Reserve) acquired the Eplands' policy, along with many others, from Lumbermen's. On October 26, 1987, Reserve notified the Eplands that it had acquired their Lumbermen's policy. The notice stated that Reserve would "guarantee that all of the protection and benefits provided by your [Lumbermen's] policy will remain intact." The notice included a "new Reserve Life policy number" and an ID card with Reserve's name on it.

A "Certificate of Assumption" was included "to be attached to and form a part of the [Lumbermen's] policy." The "Certificate of Assumption" stated:

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by ap-

[Reserve] hereby assumes as its own, direct obligation for the following numbered Policy * * * heretofore issued or assumed by [Lumbermen's], as provided in an Agreement executed by said companies. [Reserve] continues said Policy in force as a Policy of [Reserve].

All premiums now or hereafter due on said Policy are payable to [Reserve]. Subsequent premium payments made to [Reserve] shall release [Lumbermen's] from any and all liability under the Policy * * *.

From 1987 to 1990, the Eplands made premium payments to Reserve. The Eplands never received a new or updated policy from Reserve.

In September 1989, Reserve hired the Tillinghast company to "develop estimates of the economic values of [Reserve's] individual * * * health insurance [policies] * * * in the event that [they might be] sold, in whole or in part." On February 20, 1990, Reserve produced a "Confidential Offering Memorandum" of its "Individual Accident and Health Insurance Business." In this memo, Reserve decided to "exit certain insurance operations [by] sell[ing] its individual accident and health insurance business." Reserve "propose[d] to enter into an asset purchase agreement for the sale of * * * indemnity and reinsurance agreements" with National Financial Insurance Company (National). The memo stated that "[a]fter the assumption date, the Buyer [National] will renew [the] policies on its own behalf." The memo also noted the effect of Reserve's 1987 "acquisition" of Lumbermen's policies on Reserve's financial status.

On May 7, 1990, Reserve and National entered into an "Insurance Acquisition Agreement." The agreement stated:

On the Assumption Date, [National] will be the successor to [Reserve] under the Policies. As of the Assumption Date, the Policies will be direct obligations of [National], and [Reserve] will have no further obligations to the policyholders under the Policies. As of the Assumption Date, [National] will substitute itself in the place of

pointment pursuant to Minn. Const. art. VI, § 10.

[Reserve] as if named in the place of [Reserve]. The Insureds * * * under the Policies will thereafter disregard [Reserve] as a party to the Policies and treat [National] as if it had been originally obligated under the Policies. * * * After the Assumption Date, the Insureds will have the right to file claims arising under the Policies directly with [National].

After National acquired Reserve's policies, it informed the Eplands that their policy with Reserve had been "reinsured and assumed" by National, effective July 31, 1990. The National notice stated that "there are no changes in your policy" and included an ID card with National's name on it. National also included a "Notice and Certification of Assumption" which stated that

> pursuant to the terms of an Assumption Reinsurance Agreement, [the policy] issued by [Reserve] [was] assumptively reinsured by [National].
>
> All of the terms and conditions of the Policy remain unchanged, except that [National] is now the insurer. All premium payments, notices, claims, or actions on the Policy will hereafter be made directly to [National] as though it had issued the Policy originally.

The Eplands' first premium was due to National on February 20, 1991. The Eplands never received a new or updated policy from National.

After receiving the notice, the Eplands contacted National to get the name of an insurance agent because the Eplands were dissatisfied with their insurance coverage and the financial weakness of National.[1] The Eplands were concerned about home nursing care, which the policy did not cover, and National's $500 increase of their premiums.

National gave the Eplands the name of insurance agent William Meade of Meade Insurance Agency Associated Inc. In August 1990, the Eplands asked Meade to find new insurance coverage that included home nursing care. The Eplands sent Meade money for premium payments to be included with the new insurance applications. The Eplands, through Meade, filed applications and

premiums with Medico Life Insurance Company (Medico), but were denied coverage in early December 1990, because they were over 80 years old. An application and premium for Medico home care was submitted on January 31, 1991, and policies were issued March 11, 1991. The Eplands, however, canceled the Medico policies sometime thereafter. On March 13, 1991, the Eplands, through Meade, filed applications and premiums for home nursing care policies with Continental Casualty Company (CNA) and Wisconsin Insurance World (Wisconsin). On April 29, 1991, both insurance companies rejected the Eplands.

During this time, Meade told the Eplands he could use the premium proceeds "to keep [the policy with National] in force while * * * attempting to obtain the type of coverage they were looking for." In an undated, handwritten letter, Meade told the Eplands to "[b]e sure not to pay any premium on Lumbermen or National Financial—hold your notice until I get there!" In a letter dated March 11, 1991, Meade stated:

> We are awaiting the issue of *CNA nursing home policy* and will keep you informed—please use enclosed envelope to send me your premium notice for the old Kemper Lumbermen (National Financial) nursing Home policy so I can keep for my records.

The Eplands never sent Meade the notice. Meade stated, however, that the Eplands told him they were not going to renew the policy with National. On March 28, 1991, National notified the Eplands that the policy had lapsed.

Bernie Epland died April 21, 1991. Glennie Epland lived in a nursing home from October 1992, until her death on October 14, 1994. Glennie Epland accumulated more than $38,950 in nursing home costs.

Dale Epland, the Eplands' son and attorney-in-fact, brought an action against Meade, Medico, CNA, Wisconsin, Lumbermen's, Reserve, and National to determine who was liable to pay for Glennie Epland's nursing

---

1. At the time, National was a "C" rated insur- ance company by Best Insurance Reports.

home costs.[2] The Eplands made various claims against Meade, including that Meade breached his fiduciary duty by not making the premium payment to National to keep the Eplands' insurance in force. The Eplands entered into a stipulated dismissal with Meade on August 3, 1995, for $25,000. Meade's insurance license was also suspended for 90 days upon a Consent Order that charged Meade with submitting applications for coverage not available to the Eplands, holding the Eplands' funds without providing a monthly itemized statement, and failing to deliver or mail the Eplands' funds within 10 business days.

The Eplands sued Lumbermen's, Reserve, and National (respondent insurance companies) claiming that their policy with any or all of them was in force to cover the nursing home costs. The Eplands argue that the transfers of their policy from Lumbermen's to Reserve to National were novations that required their independent consent in order to be effective. The Eplands claimed they never consented to these transfers.

Respondent insurance companies argue that the agreements between Lumbermen's, Reserve, and National were all delegations of duties or assignments of rights and not novations requiring the Eplands' consent. Respondent insurance companies argue the Eplands could have filed a claim against any or all of them except that they allowed their policy to lapse by failing to pay their premium to National.

The district court granted respondent insurance companies summary judgment, stating that

> [a]n obligor on a contract is free to enter into contracts with third parties whereby the third party agrees to perform for the obligor the duties the obligor is required by the main contract to perform. Such an arrangement, subject to exceptions not applicable in this instance, can occur without the permission of the obligee to whom the performance is owed. * * * While such an arrangement relieves the original obligor of its duties only if the obligee agrees to the arrangement, *the arrangement itself*
> *is legal and not a breach of the underlying contract.*

The court concluded that the Eplands "by their own conduct, agreed to the substitution of obligors" by continuing to pay premiums to first Reserve and then National. The court then held that the Eplands "terminated the contract [with National] by their own volition." The court stated:

> Until the Eplands decided not to pay the premium they "had the benefit of their bargain," that is, if they had paid the premium their bills would have been paid by one, two or all of these insurance companies.

The court held that the failure to pay rendered the other alleged statutory violation issues moot. The Eplands appeal.

## ISSUES

1. Did the district court err in determining the agreements between Lumbermen's, Reserve, and National were delegations of duties instead of novations, which would require the Eplands' consent?

2. Did the district court err in deciding there was no insurance in force at the time in question because the Eplands did not pay the premium to National?

## ANALYSIS

■ "The construction and effect of a contract are questions of law." *Turner v. Alpha Phi Sorority House,* 276 N.W.2d 63, 66 (Minn.1979). Where the intention of the parties is totally certain from the writing, construction is for the court. *Hunt v. IBM Mid America Employees Fed. Credit Union,* 384 N.W.2d 853, 856 (Minn.1986). "Insurance coverage issues are questions of law." *State Farm Ins. Cos. v. Seefeld,* 481 N.W.2d 62, 64 (Minn.1992). A reviewing court is not bound by and need not give deference to a trial court's decision on a purely legal issue. *Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n,* 358 N.W.2d 639, 642 (Minn. 1984).

■ 1. The Eplands argue that Lumbermen's entered into an assumption agreement with Reserve, and then Reserve with Nation-

2. Medico, CNA, and Wisconsin were subsequent-ly dismissed from the suit.

al, thereby creating novations requiring the Eplands' consent. We agree. Where an insurance company (the insurer) sells to another (the reinsurer) the insurer's risks along with the premiums, it is called a "reinsurance agreement." The liability of the reinsurer is only to the insurer, to indemnify it for loss it may incur. The insurer still retains all contact with the original insured. 13A John A. Appleman & Jean Appleman, *Insurance Law and Practice* § 7681, at 480–81 (1976). Generally, the insured is not notified of the reinsurance, has no contact with the reinsurer, is not a party to the contract, and has no legal interest in the reinsurance agreement. *Id.* at 481.[3]

In contrast, when an insurance company assumes direct liability to the original insured from the original insurer, it is called a "substituted insurance" or "assumption agreement." 13A *id.*, § 7741, at 596–97. In such a transaction, the insurance risk and obligation are transferred to the other insurer. 13A *id.* at 596. In creating an assumption agreement, however, the insurer may not transfer its liability to another company and compel its policyholders to accept the new company as their insurer without the policyholder's consent. 13A *id.*, at 652–53. The policyholder may elect to repudiate or accept the assumption agreement. 13A *id.* at 653. Although an assumption agreement is not binding on policyholders, they are bound by its terms once they consent to it. 13A *id.* at 655. Thus, the original insurer is not released from its obligation on the policy unless the insured consents to the substitution of the original insurer.

Minnesota law is in agreement:

Reinsurance is a mere contract of indemnity, in which an insurer reinsures risks in another company. In such a contract the policy holders have no concern, are not the parties for whose benefit the contract of reinsurance is made, and they cannot, therefore, sue thereon. * * * Unless there was a substitution of debtors, in the nature of a novation, between the three parties, upon [which the insured's] consent to the new agreement [is required].

*Barnes v. Hekla Fire Ins. Co.*, 56 Minn. 38, 57 N.W. 314 (1893); *see also Albany Roller Mills v. Northern United Feeds & Seeds*, 397 N.W.2d 430, 433 (Minn.App.1986).

A novation is a substituted contract that includes as a party one who was neither the obligor nor the obligee of the original duty.

Restatement (Second) of Contracts § 280 (1981).

A simple novation involving a substitution of obligors results when * * * a third person promises an obligor to assume, immediately and in substitution for the obligor's duty, a duty to the obligee to render the performance that was due from the obligor or some other performance, and the obligee agrees with the obligor or with the third person to that substitution. The third person then comes under a new duty to the obligee, who is an intended beneficiary of his promise to assume * * *, and this is consideration for the obligee's agreement to discharge the original obligor. * * * However, a mere promise by a third party to assume the obligor's duty, not offered in substitution for that duty, does not result in a novation, and the new duty that the third party may owe to the obligee as an intended beneficiary is in addition to and not in substitution for the obligor's original duty. For a novation to take place, the obligee must assent to the discharge of the obligor's duty in consider-

---

3. Respondent insurance companies argue the agreements were merely delegations of duties or an assignment of rights not requiring consent of the policyholders. We disagree. We note that

> parties to bilateral contracts frequently attempt to effect the substitution of the liability of a new party for that of one of the original parties, and frequently call such an attempted transaction an assignment.
>
> By whatever name the parties may call the transaction, if it is made clear that the so-

called assignor intends by the transaction to be free from all further liability, it seems that acceptance by the other party to the contract of any subsequent performance from the so-called assignee, would amount to assent to a proposed novation, and the so-called assignor would be discharged from further liability.

3 Samuel Williston, *Williston on Contracts* § 420, at 117–18 (3d ed.1960) (footnotes omitted).

ation for the promise of the third party to undertake that duty.

*Id.* § 280, cmt. d. Minnesota law is in agreement with this definition. *See Albany Roller Mills,* 397 N.W.2d at 433 (novation extinguishes original obligation against original obligor and shifts the debt, by mutual agreement, to a new party, and requires both consent of the obligee and consideration).

■■■ A novation is never presumed, and the party asserting it has the burden of proving its essential elements. *First & Am. Nat'l Bank v. Whiteside,* 207 Minn. 537, 545, 292 N.W. 770, 775 (1940). There are four elements to a novation:

> (1) there must be an existing valid contract; (2) all parties must agree to a new contract; (3) the new contract must extinguish the old contract; and (4) the new contract must be valid.

*United Fire Ins. Co. v. McClelland,* 105 Nev. 504, 780 P.2d 193, 195 (1989). The controlling element is the intention of the parties, and unless there is a clear and definite intention on the part of all concerned to extinguish the old obligation by substituting the new insurer, then a novation is not effected. *See Tony & Leo, Inc. v. United States Fidelity & Guar. Co.,* 281 N.W.2d 862, 865 (Minn.1979) (party asserting novation must show that other party consented to novation).

■■■ In this case, we find as a matter of law that the agreements executed between respondent insurance companies were for "substituted insurance" or "assumption" agreements, which required the Eplands' consent. Under each contract, Reserve and then National, agreed to assume all liabilities and to notify policyholders by mailing "Assumption Certificates."

The Eplands received assumption certificates that indicated Lumbermen's and Reserve would be released from all liability. The Tillinghast report and Reserve's Offer-

ing Memo show that Reserve wanted to "exit certain insurance operations" by selling the policies. The Offering Memo also shows that Reserve purchased the policies from Lumbermen's in 1987. The evidence in the record clearly supports the conclusion that Lumbermen's and Reserve structured the agreements to remove any remaining liability. Thus, the assumption agreements between the respondent insurance companies were not effective against the Eplands absent proof that the Eplands consented to the substitution.

Unless Lumbermen's can establish that the Eplands consented to the substitution of Reserve, the agreement between Lumbermen's and Reserve cannot be construed to relieve Lumbermen's from its obligation of the Eplands' nursing home care coverage. If Lumbermen's can prove the Eplands consented, Reserve still bears the burden of proving the Eplands agreed to the substitution of National.

■■■ 2. The record shows that respondent insurance companies did not acquire the Eplands' written or oral consent. Consent, however, can be implied from circumstantial evidence, such as the insured's subsequent conduct. *Zieve v. Holstad Coffee Co.,* 198 Minn. 580, 584–85, 270 N.W. 581, 583 (1936). The Eplands argue that it is for a jury to determine whether they "agreed to the substitution of obligors" by continuing to pay premiums to Reserve. We agree.

Whether the Eplands consented to the novation between Lumbermen's and Reserve is a fact issue for the jury.[4] *See id.* If the jury determines the Eplands did not consent, then the Eplands' claim is against Lumbermen's, the original obligor, for breach of contract. *See* 3 Samuel Williston, *Williston on Contracts* § 420, at 117–19 (3d ed.1960) (failure to obtain consent results in breach of contract between original obligor and obligee).

---

4. We note that whether the Eplands ever really consented is highly suspect. Respondent insurance companies never sought or allowed for the Eplands' consent. They completed the sale of the policies and then informed the Eplands they had new insurers. As far as the Eplands knew, they had only one choice—pay the premiums or lose coverage. *See Security Benefit Life Ins. Co.*

*v. Federal Deposit Ins. Corp.,* 804 F.Supp. 217, 227–28 (D.Kan.1992) (mere notice to the insured and mere acquiescence to an assumption is not consent to a novation); *see also Prucha v. Guarantee Reserve Life Ins. Co.,* 358 So.2d 1155, 1157 (Fla.Dist.Ct.App.1978) (refusing to imply consent where insured had no opportunity not to consent), *cert. denied* (Fla. Apr. 16, 1979).

If the jury determines the Eplands consented to the novation between Lumbermen's and Reserve, then it must also determine whether the Eplands consented to the novation between Reserve and National. If not, then the Eplands' claim is against Reserve.

 3. If the jury determines the Eplands consented to the novation between Reserve and National, then the jury must determine whether the alleged negligence of Meade was the reason the Eplands' policy with National lapsed. National argues that the settlement with Meade bars any claim the Eplands have against it based on Meade's conduct. *See Reedon of Faribault v. Fidelity & Guaranty Ins. Underwriters*, 418 N.W.2d 488, 490 (Minn.1988) (*Pierringer* release of insurer's agent released insurer from vicarious liability). We disagree.

The Eplands' settlement with Meade has no effect on its claims against National. *See Gronquist v. Olson*, 242 Minn. 119, 125–26, 64 N.W.2d 159, 164 (1954) (injured party can still pursue remaining tortfeasors, even if claims based on same acts or circumstances, where injured party released one joint tortfeasor with no intention to release others). The Eplands sued National for National's separate coverage. If Meade's acts have anything to do with whether the Eplands had coverage with National, then Meade's actions are relevant to their case. It is for the jury to decide whether Meade was an agent of National. If so, then the jury must also decide whether Meade's alleged negligence was the cause of the Eplands' lapse.

4. Respondent insurance companies argue that even if this court decides the district court erred on the previous issues, summary judgment should still be granted on the statutory claims. We decline to address the statutory claims because the district court did not analyze them and there are disputed fact issues. *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn.1988).

## DECISION

The district court erred in dismissing the Eplands' claims for insurance coverage from the respondent insurance companies. The assumption agreements between respondent insurance companies were novations as a matter of law that required the Eplands' consent. A jury must decide whether the Eplands' continued payment of premiums to Reserve and National was consent to the novations. If the Eplands did consent, a jury must then decide whether Meade was an agent for National and whether his negligence caused the Eplands' policy to lapse.

**Reversed.**