2004 UT 70

Jerry FORD, Mark Russell, Robert P. Welch, Travis Kell, J. Mathew Zundel, David K. Eaton, John D. Ford, Robert Aamodt, D. Scott Bunnell, individuals, and others similarly situated, Plaintiffs and Appellees,

v.

AMERICAN EXPRESS FINANCIAL ADVISORS, INC., a Minnesota Corporation, Defendant and Appellant.

No. 20020550.

Supreme Court of Utah.

Aug. 20, 2004.

M. David Eckersley, John P. Ashton, Robert G. Wing, James W. McConkie, III, Salt Lake, for plaintiffs.

David A. Anderson, Elisabeth R. Blattner, Salt Lake, Charles G. Cole, Morgan D.

Hodgson, Paul J. Ondrasik, Washington, D.C., for defendant.

DURHAM, Chief Justice:

¶ 1 This case presents an appeal of the trial court's grant of partial summary judgment to class action plaintiffs, finding the defendant liable for breach of contract. All members of the plaintiff class (the Advisors) are financial planners who worked for defendant American Express Financial Advisors (AEFA) as independent contractors. The trial court allowed a jury trial on the issue of damages, and the jury returned a verdict for the Advisors of $14,109,068.82.

¶ 2 There are three main issues on appeal: (1) whether the trial court erred in granting partial summary judgment to the Advisors on the issue of whether AEFA breached a contract known as the Financial Planners Agreement (the FPA); (2) whether the trial court committed error when it granted partial summary judgment to the Advisors on AEFA's claim that a subsequent contract, known as the Business Franchise Agreement, was a substitute contract for the FPA; and (3) whether the trial court erred in granting the Advisors' motion in limine seeking exclusion of evidence regarding offsetting benefits by AEFA. We affirm on all three issues.

## BACKGROUND

¶ 3 The FPA governed the relationship between the Advisors and AEFA until March 22, 2000. The parties agree that the Advisors had to meet certain contractually specified production levels[1] in one year in order to receive contributions from AEFA toward their medical, dental, and life insurance coverage (welfare benefits) for the next fiscal year.[2] They further agree that there were other prerequisites to receiving welfare benefits contributions: the Advisors also had to elect to participate in the AEFA benefits plan and pay their own share of the premium.

¶ 4 The parties disagree about whether, as an additional prerequisite for the receipt of welfare benefits contributions, the Advisors were also required to continue to work under the FPA. The Advisors claim that their achievement of the productivity levels irrevocably "entitled" them to the benefits contributions in the following year so long as they remained associated with AEFA. AEFA counters that attaining the specified production levels rendered the Advisors merely "eligible" for the benefits contributions, and that actual payment of the benefits contributions was additionally contingent on the Advisors continuing to work under the FPA specifically.

¶ 5 On May 21, 2000, AEFA terminated the FPA and restructured its contractual relationship with the Advisors. The amount and nature of the forewarning that AEFA gave the Advisors about this termination is a matter of some disagreement, but it is undisputed that in place of the FPA, AEFA offered the Advisors two alternative "platforms" upon which to base their prospective contractual relationships with AEFA. Those who chose Platform 1 became employees of AEFA, while those who chose Platform 2 became "franchisees." All of the Advisors voluntarily chose Platform 2, which required them to sign a new contract called the Business Franchise Agreement (BFA).

¶ 6 The BFA differed from the FPA in several respects. The salient difference between the two for purposes of this appeal, however, was that under the BFA, AEFA would not pay any contributions toward the Advisors' welfare benefits. AEFA further claimed that it had no obligation to pay even the benefits contributions promised in the FPA, even though the Advisors had met the requisite production levels specified in the FPA. AEFA's refusal to pay welfare benefits contributions is primarily what gave rise to the Advisors' lawsuit against AEFA.

---

1. The contractual vernacular for these production levels is "total weighted production," or TWP. To minimize the proliferation of acronyms unnecessary to our analysis, we simply use the more generic term "production levels."

2. While most of this several hundred page contract uses language that is quite conventional, the section detailing compensation for various production levels has the evocative name "Star Quest."

¶ 7 The Advisors filed suit to recover the welfare benefits contributions they claim they were owed pursuant to the FPA. All of the Advisors had fully met the requisite production levels in 1998, 1999, or both. The trial court granted partial summary judgment to the Advisors on the issue of liability, finding as a matter of law that AEFA did breach the FPA, and that the BFA was not a substituted contract. The trial court permitted the case to proceed to a jury trial on the issue of damages only, and it granted the Advisors' motion in limine seeking exclusion of all evidence regarding offsetting benefits that AEFA claims the Advisors received as a result of AEFA's actions. The trial resulted in a jury verdict against AEFA for $14,109,068.82. After the trial court denied AEFA's motion for a new trial, AEFA appealed.

## ANALYSIS

### I. THE ADVISORS' ENTITLEMENT TO WELFARE BENEFITS CONTRIBUTIONS UNDER THE FPA

■ ¶ 8 The first issue is whether the trial court correctly granted partial summary judgment for the Advisors in ruling that AEFA breached the FPA by refusing to make welfare benefits contributions on behalf of the Advisors. There is no dispute that AEFA's "Platform Rollout" prospectively terminated AEFA's obligation to subsidize the Advisors' welfare benefits under the BFA. The key question is whether the refusal to make contributions contemplated by the FPA constituted a breach. The parties agree that Minnesota law applies to this case. The trial court found that under Minnesota law, "[e]ven if more than a tender of performance were required, the Advisors earned their benefits contributions. Earned benefits cannot be taken away."

■ ¶ 9 "[S]ummary judgment is only appropriate where 'there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law.' Utah R. Civ. P. 56(c)." *Smith v. Four Corners Mental Health Ctr., Inc.*, 2003 UT 23, ¶ 13, 70 P.3d 904. Therefore, when we review a trial court's decision granting summary judgment, "we need review only whether the trial court erred in applying the relevant law and whether a material fact was in dispute." *WebBank v. Am. Gen. Annuity Serv. Corp.*, 2002 UT 88, ¶ 13, 54 P.3d 1139. We give the trial court's legal conclusions no deference, and instead review them for correctness. *Smith*, 2003 UT 23 at ¶ 10, 70 P.3d 904.

¶ 10 AEFA challenges the trial court's legal conclusions that the Advisors "earned their benefits contributions," and "[e]arned benefits cannot be taken away." It asserts that the FPA did not give the Advisors a "guaranteed right to [benefits contributions] irrespective of whether they continued working under the FPA." The Advisors counter that they earned their benefits contributions by meeting the production goals set out in the FPA, and AEFA simply refused to honor the terms of its promise to pay the contributions. We agree with the trial court and the Advisors, and conclude that the Advisors had earned the benefits contributions pursuant to the plain terms of the FPA, and that AEFA's termination of the benefits contributions constituted a breach of the FPA.

■ ¶ 11 AEFA's offer of welfare benefits contributions in exchange for the Advisors' work and meeting of certain production levels constituted a unilateral contract that AEFA was not at liberty to revoke or modify once the Advisors began fulfilling their contractual obligations. "An offeror of a unilateral contract always retains the power to modify or revoke the offer so long as the offeree has not begun performance, but retention of that power does not preclude the offer from becoming a contract once accepted by the offeree by tender of performance." *Feges v. Perkins Rests., Inc.*, 483 N.W.2d 701, 708 (Minn.1992) (citation omitted). "[A]n offer for a unilateral contract may neither be changed nor revoked once the offeree begins the performance requested by the offer." *Peters v. Mut. Benefit Life Ins. Co.*, 420 N.W.2d 908, 914 (Minn.Ct.App.1988). "Where an employer represents in a written document distributed to employees that an employee will receive benefit payments in certain specified circumstances as an incentive for continued service, those benefits are

part of the employee's compensation which the employer is contractually obligated to pay." *Melin v. Northwestern Bell Tel. Co.*, 266 N.W.2d 183, 186 (Minn.1978) (overruling previous case that "treat[ed] benefits under a noncontributory plan as gratuities rather than contractual obligations").

¶ 12 AEFA makes no effort to refute these basic principles of law regarding unilateral contracts, or to assert that they have no application here. Rather, AEFA argues that we should find that the Advisors were not entitled to welfare benefits contributions after the termination of the FPA, even though they had achieved the required production levels, unless the FPA expressly provided that the contributions would continue after AEFA terminated the FPA. AEFA relies on several cases for this proposition, but each of them is distinguishable from the case before us.

¶ 13 The first case, *Knudsen v. Northwest Airlines, Inc.*, exemplifies the unexceptional rule that "where an employee enters into a stock option agreement that is granted on certain terms and conditions, he is bound by those conditions." 450 N.W.2d 131, 133 (Minn.1990); *see also Pillsbury v. Elston*, 283 N.W.2d 370, 374 (Minn.1979) (holding stock option repurchase provision enforceable because it was a condition to which the parties expressly agreed). The employee in *Knudsen* had been terminated, and he sued his employer to exercise stock option rights after his termination despite contractual language expressly prohibiting such action. *Knudsen*, 450 N.W.2d at 132–33. The instant case does not involve terminated employees, as *Knudsen* did. More importantly, unlike *Knudsen*, the contract here does not contain express language requiring that it be in effect in order for the Advisors to receive the benefits contributions they earned by fulfilling their contractual obligations. As we explain further below, the Advisors' rights to welfare benefits contributions were of course "granted on certain terms and provisions," as were the stock option rights in *Knudsen*, but continued work under the FPA after earning the contributions was not one of those terms and provisions.

¶ 14 AEFA also cites *Sonneman v. Blue Cross & Blue Shield*, 403 N.W.2d 701, 705 (Minn.Ct.App.1987). In *Sonneman*, the plaintiff argued that a contract providing for a lifetime "aggregate maximum" of insurance benefits evidenced Blue Cross's intent to provide coverage for the duration of medical treatment so long as that treatment was commenced while the policy was in effect. *Id.* at 704–05. The court found for the insurer based on provisions that "clearly and unambiguously" specified that coverage ended when the contract terminated, unless the plaintiff was totally disabled. *Id.* at 706. As with *Knudsen*, the distinction here is that the FPA contains no provision specifying that the Advisors' right to already-earned benefits contributions ended when the FPA terminated.

¶ 15 Finally, we reject AEFA's request that we follow the ERISA-based analysis of *Hughes v. 3M Retiree Medical Plan*, 134 F.Supp.2d 1062 (D.Minn.2001). The essence of the *Hughes* plaintiffs' claim was that their medical benefits had vested "for purposes of ERISA." *Id.* at 1068. The question of whether vesting has occurred is "a legal issue governed by ERISA" itself, *id.* at 1068–69, and therefore the court applied case law and legal rules that focused on ERISA specifically. *See id.* at 1069–70. We view the law of vested benefits under ERISA as the proverbial round hole into which AEFA urges us to squeeze this square peg of a case. Consequently, while we could probably distort this case sufficiently to render it recognizable in an ERISA context, we see no reason to do so and therefore decline.

¶ 16 The keystone of AEFA's argument is its assertion that the FPA contained a requirement that the Advisors continue working under the FPA in order to earn their benefits contributions. AEFA goes so far as to assert that the FPA is "clear" and "unambiguous" on this point, and supports this assertion with two citations to the record. Far from supporting AEFA's argument, however, examination of these citations exposes fatal flaws in AEFA's construction of the FPA. AEFA points to trial testimony of class representative Jerry Ford, in which Mr. Ford repeatedly states that he knew over the

course of his years with AEFA that he had to "elect" benefits in order to receive them. This does not in our view support AEFA's assertion that Mr. Ford and the other plaintiff class members understood and agreed that they had to continue working under the FPA in order to earn the welfare benefits contributions; indeed, it does not support AEFA's assertion at all. AEFA also directs us to a section spanning two pages of the Benefits Handbook for 1999. This section is headed "Termination of Coverage: When will my personal coverage terminate?" The section is directed toward the question of coverage under the benefit plans generally, and not to the question of the circumstances in which AEFA will contribute to or stop contributing to the cost of such coverage. Thus, we find no language in the FPA stating that the Advisors had to continue working under the FPA in order for AEFA's promise to make welfare benefits contributions to be enforceable.

¶ 17 AEFA's other arguments for such a requirement attempt to infer a requirement of continued work under the FPA from the FPA's references to "eligibility" for benefits contributions, rather than entitlement thereto, and from AEFA's reservations of rights in the FPA. The chart of "[q]ualification levels and payouts" for the Star Quest program provides: "To remain eligible for a company contribution to group benefits, advisors must meet the minimum weighted production requirement in any given year." Additionally, it states that fulfillment of production requirements is necessary for the Advisors to become "eligible to receive a Company contribution toward the cost of" welfare benefits. There is no other reference in the contract to any further condition or requirement that must be met. Having examined the FPA as a whole, therefore, we are not convinced that the use of the word "eligible" rather than "entitled" evidences an intent to make benefits contributions contingent on continued employment under the FPA. Rather, we interpret these provisions, as did the trial court, as meaning simply that, upon meeting the specified production requirements, the

Advisors would have earned and would be qualified to receive the benefit contributions. We note that the Star Quest plan provides that "[a]t Star Level 1, you *earn* a company contribution to your group benefits," and details the calculations performed to determine "what you *earn* once you reach a Star level." (Emphasis added.) Thus, when read in light of all the promises contained in the FPA, the mere use of the word "eligible" comes nowhere close to signaling, as the *Knudsen* and *Sonneman* contracts signaled, that employees' already-earned contractual rights terminated when the defendant terminated the contract.

¶ 18 AEFA argues that the following provision in the FPA constitutes an express reservation of rights: "[AEFA] make[s] no promise to continue these benefits in the future and ha[s] the right to amend or terminate any coverage for active plan participants or retired covered individuals at any time. Rights to future benefits will never vest." AEFA asserts that this provision unambiguously reserves its rights to amend or terminate the FPA. If we agreed with this reading, it would serve as a strong indicator that AEFA had expressly reserved the right to terminate benefits contributions, similar to the defendant in *Sonneman. See Sonneman*, 403 N.W.2d at 706.

¶ 19 The only reasonable reading of this provision, however, is that it applies only to ERISA benefits for employees who are not parties to this lawsuit. The provision is located in a section of the FPA that begins with the statement, "[e]xcept for the claims review procedure, this section applies only to first year financial advisors, district managers within the State of New York, field vice presidents and group vice presidents." AEFA argues that the termination provision exists in the "claims review procedure" subsection, and that it therefore applies not just to employees' ERISA benefits, but to everyone. We believe that this interpretation is unreasonable.[3] Although this section could be clearer, we are convinced that the "claims review procedure" consists of the single

---

3. The Advisors, both in their brief and at oral argument, have accused AEFA of knowingly misrepresenting the facts on this point. While we

agree that AEFA's argument rides the outer boundaries of reasonable interpretation, we give AEFA the benefit of the doubt.

paragraph with the heading "claims review procedure," and that paragraph does not include the termination provision.

¶ 20 Finally, AEFA emphasizes FPA language providing that "[w]hen this Agreement terminates, you will not, *except as provided by the Sales Compensation Plan,* be entitled to ... [a]ny further commissions, fees, overwriting or other compensation." (Emphasis added.) The benefits at issue however, *are* provided for in the Sales Compensation Plan. Consequently, the clause "except·as provided by the Sales Compensation Plan," defeats AEFA's argument. We therefore conclude that AEFA's cancellation of the FPA could not also cancel its already matured obligations under the FPA, and affirm the trial court's grant of summary judgment on this issue.

## II. WHETHER THE BFA CONSTITUTED A SUBSTITUTED CONTRACT

¶ 21 The second main issue in this appeal is whether the BFA constituted a substituted contract that replaced the FPA, thereby saving AEFA from the obligation of fulfilling its responsibilities under the FPA. The trial court granted partial summary judgment for the Advisors on this issue, and AEFA argues that this decision was in error. Because we are reviewing a grant of summary judgment, we review for correctness to determine "whether the trial court erred in applying the relevant law and whether a material fact was in dispute." *WebBank v. Am. Gen. Annuity Serv. Corp.,* 2002 UT 88, ¶ 10, 54 P.3d 1139.

¶ 22 The parties do not dispute the law applicable to this question. A substituted contract is a new contract that replaces the terms of a prior contract, thereby discharging the parties' duties under the original agreement. *Restatement (Second) of Contracts* § 279(1), (2) (1981). The party claiming the existence of a substituted contract bears the burden of proving its elements. *Epland v. Meade Ins. Agency Assocs.,* 545 N.W.2d 401, 407 (Minn.Ct.App. 1996), *rev'd on other grounds,* 564 N.W.2d 203 (Minn.1997) (citing *First & Am. Nat'l Bank v. Whiteside,* 207 Minn. 537, 292 N.W. 770, 775 (1940)). These elements are that " '(1) there must be an existing valid con-

tract; (2) all parties must agree to a new contract; (3) the new contract must extinguish the old contract; and (4) the new contract must be valid.' " *Id.* (quoting *United Fire Ins. Co. v. McClelland,* 105 Nev. 504, 780 P.2d 193, 195 (1989)); *see also Nat'l Am. Ins. Co. v. Hogan,* 173 F.3d 1097, 1105 (8th Cir.1999) (listing elements as "(1) the existence of a previous valid contract; (2) the parties agreed to a new contract; (3) the parties formed a valid new contract; (4) the parties intended to extinguish the old contract and substitute the new" (footnote omitted)).

¶ 23 In this case, the parties disagree about only one of the elements in the test for a substituted contract, namely, whether the parties intended for the BFA to extinguish obligations due and owing under the FPA. To determine the parties' intent, courts look to the parties' manifest intent, not their subjective intent. *Vacura v. Haar's Equip., Inc.,* 364 N.W.2d 387, 392 (Minn. 1985). Manifest intent can be shown by "the express words of the parties or ... the facts and circumstances attending the transaction." *Nat'l Am. Ins.,* 173 F.3d at 1107.

¶ 24 In its effort to prove that the Advisors and AEFA manifested an intent to extinguish the Advisors' rights under the FPA, AEFA relies primarily on the "Disclaimer of Benefits" provision of the BFA, which provides:

> *Disclaimer of Benefits.* Independent Advisor acknowledges that the Manuals, including the Compensation Schedule contained therein, constitute the complete list of the compensation and benefits owed Independent Advisor resulting from this Agreement or Independent Advisor's relationship with AEFA. Independent Advisor acknowledges that Independent Advisor has no claim to any other compensation or benefit plan, program or policy of or sponsored by AEFA *unless such plan, policy or benefit plan specifically references Independent Advisors in their role as Independent Advisors as an eligible group under such plan ....*

(Emphasis added.) AEFA argues that this provision evidences the parties' intent to ex-

tinguish AEFA's obligations under the FPA, and that the provision's "unless" clause does not apply. It argues that the "unless" clause does not apply because the FPA does not "specifically reference[ ] Independent Advisors in their role as Independent Advisors as an eligible group."

¶ 25 The Advisors counter that the "unless" clause does apply, for two main reasons. First, the Advisors point out that the Disclaimer of Benefits provision uses the present tense ("Independent Advisor *has* no claim ..." (emphasis added)), and this logically implies that the Independent Advisors are a group that existed prior to the introduction of the BFA and its Disclaimer of Benefits provision. Second, the Advisors argue that AEFA itself believed that the "Independent Advisors" mentioned in the Disclaimer of Benefits were the same as the "independent contractor advisors" who had participated in Star Quest pursuant to the FPA. The Advisors base this argument on deposition testimony from James Punch, who crafted the BFA, and who stated that the words "Independent Advisor" meant "[a]ny independent contractor advisor that is signing this document." Thus, the Advisors argue, the "unless" provision in the Disclaimer does apply, and therefore the Disclaimer of Benefits does not evidence any intent of the Advisors to extinguish their right to benefits contributions under the FPA.

¶ 26 AEFA has failed to convince us that the FPA did not refer to the "Independent Advisors" who were the subject of the BFA. The present-tense language of the Disclaimer of Benefits provision itself contemplates that the Independent Advisors are a group that existed prior to the creation of the BFA. Furthermore, while the FPA does not use the specific term "Independent Advisors," it does specifically refer to the Advisors as "independent contractors" and "advisors." Thus, the FPA specifically refers to the same group of people known as "Independent Advisors" under the BFA, and the Disclaimer of Benefits therefore does not indicate any intent by the Advisors to extinguish their right to the welfare benefits contributions that they had already earned under the FPA.

¶ 27 AEFA also argues that the BFA's integration clause is evidence of the parties' intent for the BFA to be a substitute contract. The integration clause provides that "[t]his Agreement, the attachments hereto, and the documents referred to herein constitute the entire Agreement between AEFA and Independent Advisor concerning the subject matter hereof, and supersede all prior and contemporaneous agreements, negotiations and representations (written and oral), no other representations having induced Independent Advisor to execute this Agreement." AEFA argues that this integration clause is clear evidence of the parties' intent to create a substitute contract. We disagree.

¶ 28 The integration clause, by its plain language, simply means that no other documents should be considered part of the BFA. The United States Court of Appeals for the Sixth Circuit faced an analogous issue in *Security Watch, Inc. v. Sentinel Systems, Inc.*, 176 F.3d 369, 372 (6th Cir.1999). The agreement at issue in *Security Watch* provided, "[t]he terms and conditions contained in this Agreement supersede all prior oral or written understandings between the parties, and constitute the entire agreement between them concerning the subject matter of this Agreement." *Id.* As in the instant case, the court had to consider whether the integration provision meant that previous contracts between the parties were superseded. *See id.* The court explained the "universally understood purpose of this boilerplate clause" thus:

> Merger clauses are routinely incorporated in agreements in order to signal to the courts that the parties agree that the contract is to be considered completely integrated. A completely integrated agreement must be interpreted on its face, and thus the purpose and effect of including a merger clause is to preclude the subsequent introduction of evidence of preliminary negotiations or of side agreements in a proceeding in which a court interprets the document.

*Id.* (citation omitted). So it is in the instant case. The BFA's integration provision simply means that the entire agreement between the parties "concerning the subject matter

hereof"—that is, concerning the Advisors' new association with AEFA after March 21, 2000—consists of "[t]his Agreement, the attachments hereto, and the documents referred to herein." Likewise, the statement that the BFA agreement and its related documents "supersedes all prior and contemporaneous agreements, ... no other representations having induced Independent Advisor to execute this Agreement," merely limits what we can evaluate when determining the parties' intent for the BFA. It says nothing about relieving AEFA of the obligations it had already incurred under the FPA.

¶ 29 We note, and reject, AEFA's argument that *In re Worldwide Direct, Inc.*, 268 B.R. 69, 72 (D.Del.2001) should persuade us that the integration clause created a substitute contract. In *Worldwide Direct,* the parties initially agreed that the claimant would receive a $700,000 cash bonus for his work. *Id.* at 70. After the debtor refused to pay cash, however, the parties agreed in a "Severance Agreement" that the claimant would receive 45,000 shares of stock in lieu of the cash. *Id.* at 71. The "Severance Agreement" of *Worldwide Direct* is thus different from the BFA because the subject matter of the Severance Agreement was essentially identical to that of the prior agreement: both dealt with how the debtor would compensate the claimant for a single period of work time. The BFA, however, concerned compensation for the Advisors' future work, rather than the work they had already completed under the FPA.

¶ 30 In sum, we hold that the BFA does not manifest any intent on the part of the Advisors to extinguish their rights under the FPA and substitute the BFA. Consequently, we need not reach AEFA's alternative argument that the BFA is ambiguous on the issue of the parties' intent, and that such ambiguity necessitates remand for presentation of extrinsic evidence at trial. We therefore affirm the trial court's grant of summary judgment on this issue.

---

**4.** AEFA asserts that if permitted to present evidence on this issue at trial, it would show that "the parties' agreement to a contract that did not

## III. OFFSETTING BENEFITS

¶ 31 The final issue we consider is whether the trial court erred by granting the Advisors' motion in limine to exclude AEFA's evidence that the Advisors benefitted from AEFA's breach of the FPA. This issue stems from AEFA's argument that its decision to discontinue welfare benefits contributions enabled AEFA to offer the Advisors higher cash commissions under the BFA than would have otherwise been possible. AEFA sought to introduce evidence at trial of how the higher commissions offered under the BFA offset the loss to the Advisors of the welfare benefits contributions. In short, AEFA sought to present evidence that had it not breached the FPA, it would not have been able to offer the Advisors the same terms under the BFA, a contract that AEFA asserts was more beneficial to the Advisors than the FPA.[4] The Advisors counter that the offsetting benefits doctrine is inapplicable where, as here, the alleged breach did not obviate the need for the plaintiffs' own performance because the Advisors had already worked the full year and met the production levels required of them under the FPA.

¶ 32 As to the standard of review on this question, AEFA argues that we should review for correctness, because the trial court "remove[d] the issue of offset to damages from jury consideration." The Advisors argue that "[t]he decision to admit or exclude evidence is reviewed for abuse of discretion."

¶ 33 We determine that the proper standard of review is a correctness standard. The trial court's rationale for granting the Advisors' motion in limine was that

[t]he offsetting benefits theory applies only where "the defendant's breach obviates the necessity for the Plaintiff's own performance or some part of it." Dan B. Dobbs Handbook of the Law of Remedies–Damages, Equity and Restitution vol. 3, 124 (2d ed., 1993). In other words, the offset rule only applies if plaintiffs are free to perform a second contract, thereby saving the cost of performance on the breached contract.

include benefits contributions permitted a payout rate on commissions of 85% rather than 83%."

As it was undisputed that AEFA did not breach the contract until after the Advisors had already worked a full year as required under the FPA, the trial court concluded that they "were not relieved of any performance under the original contract," and therefore held that the offsetting benefits theory did not apply. The trial court's decision on the Advisors' motion in limine was therefore based wholly on its legal conclusion that the offsetting benefits theory was inapplicable. Consequently, we afford the trial court's conclusions no deference. *See Anesthesiologists Assoc. v. St. Benedict's Hosp.*, 884 P.2d 1236, 1237–38 (Utah 1994) (stating that the issue of how the law of damages should be applied is a legal question and therefore giving the trial court's conclusions on the issue no deference).[5]

¶ 34 Neither the Advisors nor AEFA dispute that the offset theory is available in two basic situations. In the first, the means necessary for the plaintiff to have obtained the profit or savings from the subsequent contract would have been unavailable if the original contract had been performed. [In the second], the breach resulted in a direct and immediate savings to the plaintiff, i.e., savings on the cost of performance.

*Macon–Bibb County Water & Sewerage Auth. v. Tuttle/White Constructors, Inc.*, 530 F.Supp. 1048, 1055 (M.D.Ga.1981) (citing *La. Sulphur Carriers, Inc. v. Gulf Res. & Chem. Corp.*, 53 F.R.D. 458, 462 (D.Del.1971)); *see also* Dan B. Dobbs, *Handbook on the Law of Remedies: Damages–Equity–Restitution* § 3.6 at 183, 184 (1973) ("Benefits resulting from breach may occur in several ways. The defendant's breach of contract may free the

plaintiff to make a contract with someone else on more favorable terms.... Another kind of benefit ... is the cost of [plaintiff's] own performance which has been saved by the other's breach."). The Advisors and AEFA disagree over whether the offset theory is applicable where the plaintiff has performed its contractual obligations prior to the defendant's breach.

¶ 35 The second version of the offset theory would not apply in this case, because, given the fact that the Advisors had already worked the full term required of them under the FPA, the breach could not create "direct and immediate savings" for the Advisors. *See Macon–Bibb County Water*, 530 F.Supp. at 1055. There could be no "savings on the cost of performance" because they had already performed. *Id.* Rather, this case raises the question of whether the first form of the offset theory may apply, that is, when a breach results in a new contractual opportunity to plaintiffs that would have been unavailable but for the breach.

¶ 36 AEFA correctly notes that no case or other legal authority expressly limits the offset theory only to cases where the defendant's breach has relieved the plaintiff of an obligation of performance. Indeed, McCormick seems to suggest, at least, that the offset theory need not necessarily be limited to situations in which the plaintiff is saved the cost of performance:

Where the defendant's wrong or breach of contract has not only caused damage, but has also conferred a benefit upon the plaintiff (*such as* saving of expense of performance or making available an opportunity to dispose of goods or services) which he

---

**5.** The Advisors cite *Jensen v. Intermountain Power*, 1999 UT 10, ¶ 12, 977 P.2d 474, for the proposition that the decision to admit or exclude evidence is reviewed for abuse of discretion. The *Jensen* court, in turn, cited *Butler, Crockett & Walsh Development Corp. v. Pinecrest Pipeline Operating Co.*, 909 P.2d 225, 233 (Utah 1995), to support the rule that trial courts are granted discretion in deciding whether to admit evidence. *Jensen*, 1999 UT 10 at ¶ 12, 977 P.2d 474.

Both *Jensen* and *Butler* are readily distinguishable from the instant case. The pertinent issue in *Jensen* centered on the trial court's decision to admit "certain statistical evidence" despite one party's objection under rule 403 of the Utah

Rules of Evidence that the potential for prejudice or misleading the jury would substantially outweigh the evidence's probative value. *Id.* at ¶¶ 12–13. *Butler* is similarly distinguishable because there we had to decide whether the trial court erred in finding a proffered witness unqualified to testify as an expert under rule 702 of the Utah Rules of Evidence. 909 P.2d at 233. Thus, both *Jensen* and *Butler* involved a trial court's use of the discretion granted it under the Utah Rules of Evidence. Neither case involved the trial court's decision to exclude a whole category of evidence based on the court's determination that a particular legal doctrine was inapplicable to the case.

would not otherwise have reaped, the value of this benefit must be credited to defendant in assessing the damages.

*La. Sulphur Carriers,* 53 F.R.D. at 461 (quoting *McCormick on Damages* § 40 (1935)) (emphasis added). McCormick details several "examples" of typical applications of this rule, however, and in each of the examples, the breach has saved the plaintiff from the expense of performance, or enabled the plaintiff to utilize elsewhere the resources he would have devoted to fulfilling the contract with the defendant. *See McCormick on Damages* § 40. While McCormick does not indicate that these are the sole circumstances in which the offset theory may apply, neither McCormick nor any other authority we have examined has explicitly analyzed the propriety of applying the offset theory where the plaintiff has already fully performed its contractual obligations.

¶ 37 The primary concern of McCormick and the cases that have applied the offset theory is an equitable one: to avoid putting the plaintiff in a better position than he would have occupied but for the breach. *See id.* (stating that offset theory is "constantly applied in contract cases as a necessary corollary of the fundamental canon that the damages, as near as may be, should be such as will put the plaintiff in the position he would have been in if the contract had been fully performed"); *La. Sulphur Carriers,* 53 F.R.D. at 462 (stating that the offset theory is only applicable where failure to apply it "would permit the plaintiff to obtain unreasonable damages"). Courts are often concerned with avoiding non-collateral source windfalls to plaintiffs. *See Soules v. ISD No. 518,* 258 N.W.2d 103, 106 (Minn.1977) (explaining that a plaintiff should not be placed in a "better position than he would have been in had the contract been fully performed"); *Anesthesiologists Assoc.,* 884 P.2d at 1238. This is because compensatory damages exist simply to make the plaintiff whole by com-

pensating the plaintiff for injuries actually sustained. *Macon–Bibb County Water,* 530 F.Supp. at 1056–57.

¶ 38 The Advisors argue that not a single case applying the offset theory has involved a situation where the plaintiff had already performed. *See, e.g., Buono Sales, Inc. v. Chrysler Motors Corp.,* 449 F.2d 715 (3d Cir.1971); *Macon–Bibb County Water,* 530 F.Supp. 1048; *La. Sulphur Carriers,* 53 F.R.D. 458; *Tel–Ex Plaza, Inc. v. Hardees Rests., Inc.,* 76 Mich.App. 131, 255 N.W.2d 794 (1977); *Lee v. Yang,* 163 Or.App. 520, 987 P.2d 519 (1999). Applying the offset theory in a case where the plaintiff has substantially completed his obligations, they argue, would therefore apparently be unprecedented.[6]

¶ 39 We agree with the Advisors that the way various authorities have articulated this "subsequent contract" version of the offset theory implies that the theory is inapplicable where the plaintiff has already performed. Section 347 of the Restatement (Second) of Contracts covers the "Measure of Damages in General." It provides that the injured party in a breach of contract action

has a right to damages based upon his expectation interest as measured by

(a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus

(b) any other loss, including incidental or consequential loss, caused by the breach, less

(c) any cost or other loss that he has avoided *by not having to perform.*

*Restatement (Second) of Contracts* § 347 (1981) (emphasis added). Subsection (c) clearly indicates that the Restatement sanctions the offsetting benefits rule. We find it highly significant, therefore, that section 347 and its comments and illustrations offer no

---

6. At least one court, however, seems willing to apply the offset theory in a case where the plaintiff has performed. In *King Grain Co. v. Caldwell Manufacturing Co.,* the plaintiff had purchased a grain aeration system from the defendant, and some time after the purchase was completed, the system broke down. 820 F.Supp. 569, 570 (D.Kan.1993). Using the term "benefits rule"

instead of "offset theory," the court stated that "the benefits rule applies in contract actions and in tort actions if the defendant conferred a benefit on the plaintiff that offsets the plaintiff's loss." *Id.* at 573. The court held that the offset theory did not apply in the case, but not because the plaintiff had performed its contractual obligations. *Id.* at 573–74.

indication that damages can be reduced where the plaintiff has fully performed. Indeed, section 347(c) by its own terms only provides for reduction of damages when the nonbreaching party has avoided losses "by not having to perform." Comment d to section 347 and its illustrating scenarios provide ample additional discussion of this rule, but make no provision for offsetting benefits where the plaintiff has already performed. *See id.* § 347 cmt. d.

¶ 40 The various ways in which courts have articulated the offsetting benefits doctrine also support the Advisors' view, because courts always put the focus on whether the breach left the plaintiff free to pursue another opportunity. "In limited circumstances ... general damages may be reduced by the amount of gains received by performing another contract which could not have been entered into but for defendant's breach of the prior contract and *plaintiff's* being thereby left free to perform the second contract." *John Call Eng'g, Inc. v. Manti City Corp.*, 795 P.2d 678, 681 (Utah Ct.App.1990) (emphasis added). "[W]here a plaintiff is unable to undertake both contracts because the peculiarities of the contract ... preclude completing both, the defendant is credited with the second profit." *La. Sulphur Carriers*, 53 F.R.D. at 463. Cases employing this version of the offset theory are "premised upon the impossibility of dual performances." *Id.* (citing *Burks v. Sinclair Ref. Co.*, 183 F.2d 239 (3d Cir.1950); *Canton–Hughes Pump Co. v. Llera*, 205 F. 209 (6th Cir.1913); *Wells Aircraft Parts Co. v. Allan J. Kayser Co.*, 118 Colo. 197, 194 P.2d 326 (1947); *Baker Transfer Co. v. Merch. Refrigerating and Ice Mfg. Co.*, 12 A.D. 260, 42 N.Y.S. 76 (1896); *DeMoss v. Beryllium Corp.*, 358 Pa. 470, 58 A.2d 70 (1948)). Thus, the focus of the offsetting benefits doctrine is always on whether the breach enabled the plaintiff to enter into another contract that would otherwise have been out of the question because of the "impossibility of dual performances," *id.*, not on what the breach enabled the defendant to do.

¶ 41 AEFA cannot argue that its breach created opportunity for the Advisors by freeing them to pursue another contract instead of the FPA. The essence of AEFA's argument, rather, is that its breach created the opportunity for AEFA to offer the Advisors the BFA. Therefore, because the advisors had already performed their obligations under the FPA, we affirm the trial court's decision granting the Advisors' motion in limine to exclude AEFA's evidence of offsetting benefits.

## CONCLUSION

¶ 42 We hold that the trial court did not err in granting summary judgment to the Advisors on the issue of the Advisors' entitlement to welfare benefits contributions under the FPA, or on the issue of whether the BFA constitutes a substituted contract that extinguished the Advisors' entitlement to those contributions. The trial court correctly found that the Advisors had earned their welfare benefits contributions because the FPA contained no additional requirement that the Advisors continue working under the FPA in order to actually receive the contributions. Furthermore, the BFA was not a substituted contract because it did not include objective manifestations of the Advisors' intent to give up their earned benefits contributions in exchange for the BFA. Finally, the trial court correctly excluded AEFA's evidence that the Advisors allegedly benefitted from AEFA's breach of the FPA, because the offsetting benefits doctrine is inapplicable where the plaintiffs have fully performed their contractual obligations.

¶ 43 Affirmed.

¶ 44 Associate Chief Justice WILKINS, Justice DURRANT, Justice PARRISH, and Judge GREENWOOD concur in Chief Justice DURHAM's opinion.

¶ 45 Having recused himself, Justice NEHRING does not participate herein; Court of Appeals Judge PAMELA T. GREENWOOD sat.